1  Steven M. Tindall, SBN #187862
   Email: smt@classlawgroup.com
2  GIBBS LAW GROUP LLP
   505 14th Street, Suite 1110
3  Oakland, California 94612
   Telephone: (510) 350-9700
4  Facsimile: (510) 350-9701

5
   Beth E. Terrell, SBN #178181
6  Email: bterrell@terrellmarshall.com
   Jennifer Rust Murray, *Admitted Pro Hac Vice*
7  Email: jmurray@terrellmarshall.com
   936 North 34th Street, Suite 300
8  Seattle, Washington 98103
   Telephone: (206) 816-6603
9  Facsimile: (206) 319-5450

10
   [Additional Counsel Appear on Signature Page]
11
   *Attorneys for Plaintiff and the Proposed Class*
12
                  UNITED STATES DISTRICT COURT
13          FOR THE NORTHERN DISTRICT OF CALIFORNIA

14
   ABANTE ROOTER AND PLUMBING,          NO.  3:16-cv-05486-JCS
15 INC., individually and on behalf of all others
   similarly situated,                   **PLAINTIFF'S NOTICE OF MOTION**
16                                        **AND MEMORANDUM OF POINTS AND**
                  Plaintiff,             **AUTHORITIES IN SUPPORT OF**
17                                        **PLAINTIFF'S RENEWED MOTION**
        v.                                **FOR PRELIMINARY APPROVAL OF**
18                                        **AMENDED CLASS ACTION**
   PIVOTAL PAYMENTS INC., d/b/a/          **SETTLEMENT**
19 CAPITAL PROCESSING NETWORK and
   CPN,                                   JURY TRIAL DEMAND
20
                  Defendant, Third Party Plaintiff,  Complaint Filed:  September 26, 2016
21
        v.                                DATE:         March 16, 2018
22                                        TIME:         9:30 a.m.
   GORDON ROSE, an individual, and EPLJ,  LOCATION:   Courtroom G - 15th Floor
23 LLC a/k/a EPLJ, LLC, a business entity of
   unknown form,
24
                  Third Party Defendant.
25

26

27 PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS
   AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION
   FOR PRELIMINARY APPROVAL OF AMENDED CLASS ACTION
   SETTLEMENT
   CASE NO. 3:16-CV-05486-JCS

1   TO:    THE CLERK OF THE COURT; and

2
3   TO:    DEFENDANT PIVOTAL PAYMENTS, INC., d/b/a CAPITAL PROCESSING
           NETWORK and CPN, and THEIR ATTORNEYS OF RECORD:

4          PLEASE TAKE NOTICE that on March 16, 2018, at 9:30 a.m., in Courtroom G - 15th

5   Floor, of the San Francisco Courthouse for the U.S. District Court for the Northern District of

6   California, 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiff will move for

7   preliminary approval of a class action settlement.

8          This motion will be based on: this Notice of Motion; the following Memorandum of

9   Points and Authorities; the Declarations of Jennifer Rust Murray, Cameron R. Azari, and Philip

10  Fayer in support of this motion; Plaintiff's original Unopposed Motion for Preliminary Approval

11  (ECF No. 70); the Declarations of Jennifer Rust Murray (ECF No. 71), Anthony Paronich (ECF

12  No. 72), Matthew P. McCue (ECF No. 73), Steven Tindall (ECF No. 74), and Fred Heidarpour

13  (ECF No. 75) in support of Plaintiff's original Motion for Preliminary Approval; the records and

14  file in this action; and on such other matter as may be presented before or at the hearing of the

15  motion.

16

17

18

19

20

21

22

23

24

25

26

27

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ..................................................................................................2

      A.    Plaintiff's claims .....................................................................................2

      B.    The litigation and settlement negotiations .............................................3

      C.    Plaintiff's motion for preliminary approval and the Court's concerns ................4

      D.    The Amended Settlement Agreement ......................................................5

            1.    The proposed revised Class ..........................................................6

            2.    The proposed revised release ........................................................6

            3.    Allocation of the settlement fund ..................................................7

            4.    The revised requested service award ............................................7

III.  ARGUMENT AND AUTHORITY ......................................................................8

      A.    The amended Class should be preliminarily certified for settlement
            purposes only ...........................................................................................9

            1.    The Class satisfies the requirements of Rule 23(a) .....................10

            2.    The Class satisfies the requirements of Rule 23(b)(3) .................12

      B.    The proposed settlement should be preliminary approved .....................13

            1.    ███████████████████████ ...........................................14

            2.    Plaintiff faced the serious risk that it would lose on the merits ..............16

      C.    The claims process is necessary under the circumstances .....................21

      D.    The Amended Settlement is reasonable in light of Plaintiff's revised
            requested service award and Plaintiff counsel's request for fees and costs ........25

            1.    The requested service award is reasonable ..................................25

1

2.      Plaintiff counsel's request for 25% of the settlement fund
is reasonable.............................................................................26

E.     The proposed notice plan should be approved....................................................28

1.      The settlement provides for the best method of notice practicable
under the circumstances..........................................................28

2.      The proposed form of notice adequately informs Class members
of the settlement and their rights.............................................29

F.     The schedule for final approval .......................................................29

IV.    CONCLUSION..........................................................................................................30

# TABLE OF AUTHORITIES

**Page**

*Adams v. AllianceOne Receivables Mgt., Inc.*,
No. 3:08-cv-00248, ECF Nos. 137 & 109 (S.D. Cal.) ....................................................20

*Agne v. Papa John's Int'l, Inc.*,
286 F.R.D. 559 (W.D. Wash. 2012) ....................................................................11, 13

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ...........................................................................................9

*Arthur v. Sallie Mae, Inc.*,
No. 2:10-cv-00198, ECF Nos. 266 & 219 (W.D. Wash.) .................................................20

*Barani v. Wells Fargo Bank, N.A.*,
No. 12-cv-2999-GPC (KSC), 2014 WL 1389329 (S.D. Cal. Apr. 9, 2014) .................24

*Bayat v. Bank of the West*,
No. 13-cv-2376, ECF Nos. 72 & 64 (N.D. Cal.) ....................................................20, 26

*Bee, Denning, Inc. v. Capital Alliance Group*,
310 F.R.D. 614 (S.D. Cal. 2015) ...................................................................13

*Betorina v. Randstad US, L.P.*,
No. 15-cv-03646-EMC, 2017 WL 1278758 (N.D. Cal. Apr. 6, 2017) ...........................9

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .........................................................................................26

*Booth v. Appstack, Inc.*,
No. C13-1533 JLR, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) ...........................12

*Braynen v. Nationstar Mortg., LLC*,
No. 14-CV-20726, 2015 WL 6872519 (S.D. Fla. Nov. 9, 2015) ...................................23

*Celano v. Marriott Int'l Inc.*,
242 F.R.D. 544 (N.D. Cal. 2007) ...................................................................10

*Chavez v. PHC Corp.*,
No. 13-cv-01797-LHK, 2015 WL 581382  (N.D. Cal. Feb. 11, 2015) ........................29

*Churchill Village, L.L.C. v. General Electric*,
361 F.3d 566 (9th Cir. 2004) ...................................................................9, 14

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ........................................................14

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) ......................................................26

*Cotter v. Lyft, Inc.*,
    193 F. Supp. 3d 1030 (N.D. Cal. 2016) ...........................................9

*Couser v. Comenity Bank*,
    No. 12-cv-2484, ECF No. 91 (S.D. Cal.).........................................20

*Dakota Med., Inc. v. RehabCare Group, Inc.*,
    No. 1:14-cv-02081-DAD-BAM, 2017 WL 4180497 (E.D. Cal. Sept. 201, 2017)...14, 15

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .....................................................9, 11

*Franklin v. Wells Fargo Bank*,
    No. 14-cv-2349, ECF No. 47 (S.D. Cal.).........................................20

*Gehrich v. Chase Bank USA, N.A.*,
    316 F.R.D. 215 (N.D. Ill. 2016)..................................................15

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...................................................9, 11

*Harris v. Vector Mktg. Corp.*,
    No. C-08-5198 EMC, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ............22

*Hawthorne v. Umpqua Bank*,
    No. 11-cv-6700-JST, 2014 WL 4602572 (N.D. Cal. Sept. 15, 2014) ..........29

*Ikuseghan v. Multicare Health System*,
    No. C14-5539 BHS, 2015 WL 4600818 (W.D. Wash. July 29, 2015)............12

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) .....................................................27

*In re Capital One TCPA Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ..............................................15

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12*,
    MDL No. 1643, 2006 WL 3332829 (E.D. La. Nov. 15, 2006) ....................23

*In re Hyundai and Kia Fuel Economy Litig.,*
    --- F.3d ---, 2018 WL 505343 (9th Cir. Jan. 23, 2018)....................................................9

*In re Online DVD Antitrust Litig.,*
    779 F.3d 934 (9th Cir. 2016) ............................................................11, 24, 26

*In re Tableware Antitrust Litig.,*
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ....................................................8

*In re Uber FCRA Litigation,*
    Case No. 14-cv-05200-EMC, 2017 WL 2806698 (N.D. Cal. June 29, 2017) .........22, 23

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.,*
    MDL No. 2672 CRB (JSC), 2017 WL 2212783 (N.D. Cal. May 17, 2017) ...................8

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
    19 F.3d 1291 (9th Cir. 1994) ....................................................27

*Jones v. Royal Admin. Servs. Inc.,*
    866 F.3d 1100 (9th Cir. 2017) ....................................................2, 16, 17, 18

*Krakauer v. Dish Network L.L.C.,*
    311 F.R.D. 384 (M.D.N.C. 2015) ....................................................12

*Krakauer v. Dish Network, L.L.C.,*
    No. 1:14-CV-333 (M.D. N.C. Jan. 25, 2018) ....................................................22

*Kramer v. Autobytel, Inc.,*
    No. 4:10-cv-02722, ECF Nos. 148 & 137-5 (N.D. Cal.)....................................20, 26

*Kristensen v. Credit Payment Servs.,*
    12 F. Supp. 3d 1292 (D. Nev. 2014)....................................................10

*Kristensen v. Credit Payment Servs., Inc.,*
    --- F.3d ---, 2018 WL 343758 (9th Cir. Jan. 10, 2018)....................................2, 16, 18

*Kwan v. Clearwire Corp.,*
    No. 2:09-cv-01392, ECF Nos. 201, 190 & 184 (W.D. Wash.)....................................20

*Lemus v. H & R Block Enters. LLC,*
    No. C 09-3179 SI, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) ..............................24

*Linney v. Cellular Alaska P'ship,*
    151 F.3d 1234 (9th Cir. 1998) ....................................................20

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) ......................................................................................13

*Malta v. Freddie Mac & Wells Fargo Home Mtg.*,
   No. 3:10-cv-01290, ECF Nos. 91 & 60-1 (S.D. Cal.)......................................................21

*Milliron v. T-Mobile USA, Inc.*,
   No. 08-cv-4149 (JLL), 2009 WL 3345762 (D.N.J. Sept. 10, 2009) ..............................24

*Officers for Justice v. Civil Service Commission of City & County of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ...................................................................................8, 20

*Pelletz v. Weyerhaeuser Co.*,
   592 F. Supp. 2d 1322 (W.D. Wash. 2009).....................................................................26

*Philips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)........................................................................................................29

*Rinky Dink, Inc. v. World Business Lenders*,
   Case No. 14-0268-JCC, 2016 WL 4052588 (W.D. Wash. Feb. 3, 2016) .....................24

*Rinky Dink, Inc. v. World Business Lenders, LLC*,
   Case No. C14-0268-JCC, 2016 WL 3087073 (W.D. Wash. May 31, 2016).................15

*Rodriguez v. W. Pub'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ...................................................................................8, 26

*Roper v. Consurve, Inc.*,
   578 F.2d 1106 (5th Cir. 1978) ......................................................................................12

*Rose v. Bank of Am.*,
   No. 5:12-cv-4009-EJD, ECF No. 59 (N.D. Cal.)............................................................21

*Rubin v. Assicurazioni Generali S.P.A.*,
   290 F. App'x 376 (2d Cir. 2008) ..................................................................................25

*Sarabri v. Weltman, Weinberg & Reis Co.*,
   L.P.A. No. 3:10-cv-01777-AJB-NLS, ECF Nos. 24 & 28 (S.D. Cal.)..........................21

*Schaffer v. Litton Loan Servicing, LP*,
   No. CV 05-07673 MMM (JCx), 2012 WL 10274679 (C.D. Cal. Nov. 13, 2012) .........29

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill.) ....................................................................................25

*Shames v. Hertz Corp.*,
    No. 07-cv-2174-MMA(WMC), 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ..............24

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ........................................................................................27

*Steinfeld v. Discover Fin. Servs.*,
    No. 3:12-cv-01118-JSW, ECF No. 65 (N.D. Cal.)....................................................21, 26

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)................................................................................................12

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976) ........................................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)....................................................................................................10

*Whitaker v. Bennett Law, PLLC*,
    No. 13-3145, 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014)..........................................10

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ......................................................................................13

**FEDERAL RULES**

Fed. R. Civ. P. 23............................................................................................ *passim*

**FEDERAL STATUTES**

47 U.S.C. § 227................................................................................................ *passim*

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 4.03 ......................................................................18

Restatement (Third) of Agency § 4.06 ......................................................................19

# I.  INTRODUCTION

Plaintiff Abante Rooter and Plumbing, Inc. ("Plaintiff") seeks preliminary approval of a proposed settlement that requires defendant Pivotal Payments, Inc. ("Pivotal") to pay $9,000,000 to establish a common fund on behalf of a proposed "Class" of persons who Plaintiff alleges received pre-recorded calls selling Pivotal's payment processing services. The settlement resolves claims against Pivotal for its alleged violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227.

On December 1, 2017 the Court provided feedback to the parties regarding their original settlement and denied Plaintiff's motion for preliminary approval without prejudice. To address the Court's concerns, the parties renegotiated and executed an Amended Settlement Agreement that includes a revised Class definition that conforms to the evidence obtained during the litigation and a revised release to clarify that Class members are only releasing claims associated with calls placed by third parties EPLJ Enterprises, LLC ("EPLJ") and Gordon Rose on behalf of Pivotal.  In addition, the Amended Agreement allocates settlement funds on a "per call" basis rather than a "per Class member" basis so that Class members who received multiple calls will receive a larger share of the settlement than Class members who only received one call. And Plaintiff will only request a $2,000 incentive award instead of the $25,000 sought previously.

In support of the Amended Agreement, Pivotal submits additional evidence, including (1) a declaration from Pivotal's principal Philip Fayer attaching financial documents ███████ ████████████████████████████████████ and (2) a declaration from proposed class action settlement administrator Epiq Class Action & Claims Solutions, Inc. ("Epiq") that explains why a claims process is necessary and justified given the circumstances of this case.

Plaintiff likewise addresses in this motion the serious litigation risks it faced if the parties had not settled. It is undisputed that Pivotal did not physically place the calls at issue in this case itself. Plaintiff can prevail only if it proves that Pivotal is vicariously liable for the calls under federal agency law principles. The Ninth Circuit recently issued two decisions affirming

1   dismissal of two TCPA cases on summary judgment, finding that the defendants could not be

2   held vicariously liable for the calls at issue. *See Jones v. Royal Admin. Servs. Inc.*, 866 F.3d 1100

3   (9th Cir. 2017) and *Kristensen v. Credit Payment Servs., Inc.*, --- F.3d ---, 2018 WL 343758 (9th

4   Cir. Jan. 10, 2018). Plaintiff continues to believe that that these cases are distinguishable from

5   this one. However, during settlement negotiations, they were forced to acknowledge that if the

6   Court or Ninth Circuit disagreed, the Class would recover nothing. Even if Plaintiff prevailed at

7   summary judgment, a serious risk existed that credibility issues with key witness Gordon Rose

8   would result in a defense verdict.

9       Considering the substantial risks Plaintiff faced on the merits and ███████████████

10  ██████████████ Plaintiff and its counsel believe the $9,000,000 non-reversionary settlement

11  represents an excellent result for the Class and ensures that Class members will receive monetary

12  compensation as opposed to potentially obtaining nothing. Accordingly, Plaintiff respectfully

13  renews its request for preliminary approval of a Class-wide settlement (i.e., approval of the

14  proposed Amended Settlement Agreement attached as Exhibit 1 to the Declaration of Jennifer

15  Rust Murray) and entry of an order that (1) certifies the proposed amended Class for settlement

16  purposes only; (2) grants preliminary approval of the proposed settlement; (3) directs notice to be

17  disseminated to Class members in the form and manner proposed by the parties and which is

18  consistent with due process; (4) appoints Epiq to serve as the settlement administrator; and (5)

19  sets a hearing date for final settlement approval and a schedule for related deadlines.

20                              **II.   BACKGROUND**

21  **A.    Plaintiff's claims.**

22      Pivotal provides merchant processing services to businesses nationwide. Plaintiff alleges

23  that Pivotal hired EPLJ, a business operated by Gordon Rose, to make calls by automatic

24  telephone dialing system ("ATDS") to market its credit card processing services. Plaintiff alleges

25  that the recipients of these calls, including Plaintiff, did not consent to receive them. ECF No. 1

26

27

¶¶ 20-21. Plaintiff alleges it received multiple calls made on Pivotal's behalf on its cell phones. *Id.* ¶¶ 22-72. Plaintiff never consented to receive the calls. *Id.* ¶¶ 73-74.

Plaintiff filed a proposed class action complaint on September 26, 2016, alleging that Pivotal violated the TCPA's prohibition of calls to cell phones using an ATDS or artificial or prerecorded voice and that Pivotal and the persons and entities acting on its behalf acted knowingly or willfully. *Id.* ¶¶ 91-97. Plaintiff sought damages in the amount of $500 for every illegal call and sought to treble those damages because of Pivotal's alleged knowing or willful violations of the TCPA. *Id.*

**B.     The litigation and settlement negotiations.**

The parties litigated this action for a year before they commenced settlement negotiations. Pivotal filed a motion to dismiss, challenging Plaintiff's Article III standing to pursue its claims. ECF No. 15. Plaintiff successfully opposed the motion. ECF No. 19. In denying Pivotal's motion, the Court held that Plaintiff has Article III standing to pursue its claims, that Plaintiff's allegations stated a claim for relief, and that Pivotal's motion to strike allegations of the complaint was unconvincing. ECF No. 27.

The parties engaged in substantial discovery. Plaintiff served interrogatories and two sets of requests for production on Pivotal. ECF No. 71 ¶ 11. Plaintiff also pursued third-party discovery from the entity that placed the calls, EPLJ, and its principal, Gordon Rose, obtaining crucial calling records documenting the calls that EPLJ and Mr. Rose allegedly placed on Pivotal's behalf. *Id.* ¶ 13. Pivotal, EPLJ, and Mr. Rose produced approximately 17,000 pages of documents, which Plaintiff's counsel reviewed and analyzed. *Id.* Plaintiff retained expert Jeffrey Hansen to analyze this calling data. Mr. Hansen determined that EPLJ made 11,593,672 autodialed calls to 1,902,283 unique cellular telephone numbers. *Id.* ¶ 15. Mr. Hansen also opined that EPLJ had used an autodialer to place the calls. *Id.* Plaintiff also responded to Pivotal's discovery requests and Pivotal deposed Plaintiff's principals. *Id.* ¶¶ 11, 15. Plaintiff deposed Mr. Rose. Pivotal's counsel attended the deposition and cross-examined Mr. Rose.

When Pivotal indicated that it planned to move for motion for summary judgment as to its alleged vicarious liability for the calls made by EPLJ, the parties briefed the issue of whether Plaintiff should be able to file its motion for class certification first. ECF No. 55. The Court ruled that Pivotal could file its summary judgment motion, ECF No. 58, and the parties stipulated to a briefing schedule for summary judgment to be followed, if necessary, by a class certification hearing. ECF No. 60.

The parties mediated with Bruce Friedman, Esq. of JAMS on August 31, 2017. Mr. Friedman has extensive experience mediating TCPA cases, including cases involving vicarious liability allegations like this one. Declaration of Jennifer Rust Murray ("Murray Decl.") ¶ 3. During the mediation, Pivotal told Plaintiff's counsel that it was uninsured and did not have the money to fund a large settlement. *Id.* Plaintiff's counsel did not take Pivotal's assertions at face value, demanding that Pivotal provide financial documentation supporting its assertions. *Id.*

The parties also submitted mediation briefs, detailing the strengths of their respective claims and defenses. Murray Decl. ¶ 4. Mr. Friedman challenged Plaintiff's counsel on the strength of Plaintiff's vicarious liability theory and emphasized the significant risk Plaintiff faced if it pursued litigation. *Id.* The parties exchanged proposals and counterproposals, but could not resolve the dispute by the end of the day. *Id.* Following the full-day mediation, Mr. Friedman continued to work with the parties. After several follow-up calls, the parties reached an agreement in principle, but it took several additional weeks to hammer out the details. *Id.*

**C.    Plaintiff's motion for preliminary approval and the Court's concerns.**

On November 1, 2017, Plaintiff filed a motion for preliminary approval of the class action settlement it reached with Pivotal. *See* ECF No. 70. This Court held a hearing and denied Plaintiff's motion without prejudice on December 1, 2017. ECF No. 78. During the hearing, the Court raised four issues concerning the proposed settlement. First, the Court questioned whether the settlement amount was adequate in light of Defendant's "extraordinary [potential] exposure." Murray Decl., Ex. 2 at 2:20–24. The Court noted that Plaintiff had provided two reasons for the

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 4
Case No. 3:16-cv-05486-JCS

1   settlement discount, i.e., Pivotal's financial condition and its good defenses to liability. *Id.* at

2   2:25–3:25. However, the Court was not satisfied that Plaintiff had presented sufficient evidence

3   on the financial condition of the defendant "other than plaintiff's counsel's say so and defense

4   counsel's say so." *Id.* The Court concluded that it had "no evidence to justify" approving a

5   settlement that provides only a fraction of the defendant's total potential liability. *Id.* The Court

6   therefore asked the parties to provide evidence of Pivotal's financial condition as well as

7   evidence demonstrating the viability of Pivotal's defenses that would justify the $9 million

8   amount. *Id.*

9       Second, the Court asked the parties to explain why a "claims-made" procedure was

10  justified in this case. *Id.* at 3:24–4:3. In addition, the Court inquired as to why Class members

11  who received multiple calls should receive the same amount as those who received one call. *Id.*

12  at 4:4–5.

13      Third, the Court observed that the amount of the requested incentive award was too

14  high. The Court also commented about the amount of the requested attorneys' fees, but did not

15  mandate any specific changes, presumably because that issue can be addressed in connection

16  with final approval and both the original version of the settlement agreement as well as the

17  Amended Settlement Agreement note that the amount of the fees and costs awarded is not a

18  condition of the settlement.

19      Finally, the Court noted that the Class definition was too broad and stated that it needed

20  to be limited to the calls placed by EPLJ and Mr. Rose. *Id.* at 5:21–6:17.

21  **D.    The Amended Settlement Agreement.**

22      The terms of the settlement were originally memorialized in the parties' Class Action

23  Settlement Agreement and Release of Claims. ECF No. 71-1. To address the issues the Court

24  raised at the December 1, 2017 preliminary approval hearing, the parties renegotiated the

25  settlement over the course of several weeks. Murray Decl. ¶ 7. The Amended Settlement

26

27

Agreement, which is attached as Exhibit 1 to the Murray Declaration, differs from the original

agreement as follows:

    1.    <u>The proposed revised Class.</u>

The proposed revised Class is defined as:

> All individuals, entities and persons to whom: (a) EPLJ or Gordon Rose
> made one or more non-emergency telephone calls; (b) allegedly on
> Pivotal's behalf; (c) promoting credit card processing services, other
> services, or goods of any kind; (d) to their cellular telephone number; (e)
> through the use of an automatic telephone dialing system or an artificial or
> prerecorded voice; and (f) at any time in the period from April 15, 2016 up
> through and including September 2, 2016.

Murray Decl., Ex. 1 at § 1.4. The revised Class addresses the concerns the Court raised at the

December hearing because it is limited to individuals to whom EPLJ and Mr. Rose placed calls

in an attempt to generate new business for Pivotal. It also limits the Class period so that it

commences on April 15, 2016, which is the date the contract between EPLJ and Pivotal was

executed (*see* ECF No. 55, Ex. 1) and the approximate date that the relationship between EPLJ

and Pivotal concluded. Murray Decl., Ex. 3 at 93:18–94:8.

    2.    <u>The proposed revised release.</u>

Although the Court did not specifically ask the parties to amend the agreement to revise

the release, the Court mentioned during the prior hearing that the release should likewise be tied

to the calls made by EPLJ and Mr. Rose. *See* Murray Decl., Ex. 2 at 5:25–6:9. To clarify that the

release is in fact limited to calls made by EPLJ and Mr. Rose, the Amended Settlement

Agreement defines "Released Claims" as follows:

> Any and all claims based on or arising out of the Telephone Consumer
> Protection Act, 47 U.S.C. § 227, as well as any similar state law that
> Participating Class Members could have asserted against the Released
> Parties based on telephone calls placed by EPLJ or Gordon Rose between
> April 15, 2016 up through and including September 2, 2016 to the extent
> the telephone calls were allegedly placed on behalf of any of the Released
> Parties.

Murray Decl., Ex. 1 at § 1.28.

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 6
Case No. 3:16-cv-05486-JCS

3.    Allocation of the settlement fund.

To address the Court's concern that the original settlement did not consider the number of calls each Class member received when calculating individual awards, the Amended Settlement Agreement provides that Class member awards will be determined through the following formula:

> Net Settlement Fund (i.e., the Gross Settlement Payment less the Settlement Administration Expenses, the Fee Award and the Service Award) divided by the total calls received by Participating Class Members that submitted timely and valid Claim Forms as set forth in EPLJ's records multiplied by the total calls received by each Participating Class Member (NSF/total claimant calls x individual claimant's total calls = Individual Settlement Payment).

*See* Murray Decl., Ex. 1 at § 11.2. The revised formula ensures that Class members who allegedly received more calls will receive a larger individual award.

The parties also revised the proposed claim form so that it clearly indicates the number of calls each Class member received. *See* Declaration of Cameron R. Azari ("Azari Decl."), Attachment 2. Class members can also visit the Settlement Website, type in the telephone numbers at which they received the calls, and learn the number of calls that calling records produced by EPLJ indicate were placed to those numbers. *Id.*

According to calling records obtained in this case, the average Class member received six calls and the median was five calls. Murray Decl. ¶ 9. The minimum number of calls placed to a Class member was one and the maximum was forty-four. *Id.* Based on a 10% claims rate, Plaintiff's counsel estimate that a claimant who received the average six calls will receive approximately $28. *Id.* If 5% of the calls are claimed, a Class member who received six calls will receive approximately $56. *Id.*

4.    The revised requested service award.

At the December hearing, the Court commented that the requested $25,000 incentive award was too large and would have to be substantially reduced. To address this comment, the Amended Settlement Agreement provides that Plaintiff will apply for a service award in the

1  amount of $2,000, to be paid from the settlement fund. Murray Decl., Ex. 1 at § 4.3. The

2  Amended Settlement Agreement notes that the amount of the service award is within the Court's

3  discretion and is not a condition of the settlement. Any order by the Court providing for a service

4  award that is less than the amount requested "will not be grounds to rescind the Amended

5  Settlement Agreement or otherwise void the settlement." *Id.*

## III.  ARGUMENT AND AUTHORITY

7          In the Ninth Circuit, "there is an overriding public interest in settling and quieting

8  litigation …particularly … in class action suits." *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943,

9  950 (9th Cir. 1976). Courts recognize that as a matter of sound policy, settlements of disputed

10 claims are encouraged and a settlement approval hearing should not "reach any ultimate

11 conclusions on the contested issues of fact and law which underlie the merits of the dispute."

12 *Rodriguez*, 563 F.3d at 964 (citation omitted).

13         Proposed class action settlements are not effective unless approved by the Court. Fed. R.

14 Civ. P. 23(e). The main purpose of the Court's supervision of class action settlements is to

15 ensure "the agreement is not the product of fraud or overreaching by, or collusion between, the

16 negotiating parties." *Officers for Justice v. Civil Service Commission of City & County of San*

17 *Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Courts use a "two-step process" for the approval

18 of class action settlements, in which courts "first 'determine[] whether a proposed class action

19 settlement deserves preliminary approval and then, after notice is given to class members,

20 whether final approval is warranted." *In re Volkswagen "Clean Diesel" Marketing, Sales*

21 *Practices, and Products Liability Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 2212783, at *9

22 (N.D. Cal. May 17, 2017) (citation omitted).

23          In the past, courts have focused only on whether the proposed agreement appears to be

24 non-collusive, is free of "obvious deficiencies," and generally falls within the range of "possible"

25 approval. *See, e.g., In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal.

26 2007). More recently, several courts in this district have required a more fulsome consideration

27

of the merits of a settlement at the preliminary approval stage. *See Betorina v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758, at *6 (N.D. Cal. Apr. 6, 2017); *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036 (N.D. Cal. 2016). These courts apply the factors set forth by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), and *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575-76 (9th Cir. 2004), to determine whether a settlement is fair, adequate, and reasonable at the final approval stage. These factors include: (1) the strength of Plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status through trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) the reaction of the class members to the proposed settlement; and (9) whether the settlement is a product of collusion among the parties.

When a case settles before class certification, the Court must also determine as part of the preliminary approval evaluation whether the class satisfies the Rule 23 requirements for class certification. *See In re Hyundai and Kia Fuel Economy Litig.*, --- F.3d ---, 2018 WL 505343, at *2 (9th Cir. Jan. 23, 2018). Because a settled case will not be tried, manageability considerations are not relevant. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

**A.     The amended Class should be preliminarily certified for settlement purposes only.**

Plaintiffs requesting class certification must demonstrate "that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). The proposed amended Class definition, which is narrowly tailored to conform to the evidence obtained in this litigation, satisfies all Rule 23 requirements.[1]

---

[1] For settlement purposes only, Pivotal does not dispute this characterization. In the event the proposed settlement were to be rejected for any reason, Pivotal reserves all of its rights to contest class certification.

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 9
Case No. 3:16-cv-05486-JCS

1        1.    <u>The Class satisfies the requirements of Rule 23(a).</u>

2        The Rule 23(a) requirements are numerosity, commonality, typicality and adequacy. Fed.

3    R. Civ. P. 23(a). The proposed Class includes approximately 1.9 million people, which easily

4    satisfies the numerosity requirement. *See Celano v. Marriott Int'l Inc.*, 242 F.R.D. 544, 548-49

5    (N.D. Cal. 2007) (numerosity is generally satisfied when the class comprises 40 members or

6    more). The proposed Class also satisfies the commonality requirement of Rule 23(a), which

7    requires that class members' claims "depend upon a common contention," of such a nature that

8    "determination of its truth or falsity will resolve an issue that is central to the validity of each

9    [claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The central

10   questions in this case are whether Pivotal is vicariously liable for calls made by EPLJ and

11   whether the calls violated the TCPA. The answers to these questions turn on common evidence

12   and can be fairly resolved for all Class members at one time. *See, e.g., Kristensen v. Credit*

13   *Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (finding that questions of vicarious

14   liability satisfied commonality because the issue "turns on the federal common law of agency

15   and can arise from actual authority, apparent authority, or ratification" a determination of which

16   will depend either on the defendants' conduct rather than class members); *Whitaker v. Bennett*

17   *Law, PLLC,* No. 13-3145, 2014 WL 5454398, at *5 (S.D. Cal. Oct. 27, 2014) (finding that

18   commonality was satisfied where the central issue was whether the defendant used an ATDS or

19   prerecorded or artificial voice to make unsolicited calls).

20       Typicality is satisfied if "the claims or defenses of the representative parties are typical of

21   the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the

22   claims of other Class members because they arise from the same course of alleged conduct by

23   Pivotal and are based on the same legal theories. Typicality is readily satisfied in TCPA cases

24   like this one, where the claims are based on the defendant's alleged common, coordinated

25   telemarketing campaigns. *See, e.g.*, *Whitaker*, 2014 WL 5454398, at *5 (finding typicality

26   satisfied because each class member's claim "revolves exclusively around [the defendant's]

27

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 10
Case No. 3:16-cv-05486-JCS

1    conduct as it specifically relates to the alleged violations of the TCPA"); *Agne v. Papa John's*

2    *Int'l, Inc.*, 286 F.R.D. 559, 569 (W.D. Wash. 2012) (finding typicality satisfied where the

3    plaintiff's claims, "like all class members' claims, arise from text marketing campaigns

4    commissioned by Papa John's franchisees and executed by the same marketing vendor …").

5    That is especially true here, where each proposed Class member was allegedly sent the same pre-

6    recorded message from the same third-party vendor using the same equipment.

7          Finally, the adequacy requirement is satisfied when the class representatives will "fairly

8    and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To make this

9    determination, "courts must resolve two questions: '(1) do the named plaintiffs and their counsel

10   have any conflicts of interest with other class members and (2) will the named plaintiffs and their

11   counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting

12   *Hanlon*, 150 F.3d at 1020). Plaintiff has no conflicts of interest with the other proposed Class

13   members and has demonstrated its commitment to the Class by actively participating in the

14   litigation. *See* ECF No. 75. Plaintiff is represented by counsel who are experienced in litigating

15   class action cases and TCPA claims in particular, and who were previously appointed by the

16   Court to represent class members' interests in other cases. ECF No. 38; ECF No. 71 ¶¶ 3–8; ECF

17   No. 72 ¶ 3; ECF No. 73 ¶¶ 3–9; and ECF No. 74 ¶¶ 1–8.

18         At the December hearing, the Court observed that Plaintiff might not be an adequate

19   representative to the extent he sought a $25,000 service award to compensate him for

20   prosecuting the lawsuit on behalf of the Class. But the amount of the service award has now been

21   lowered to $2,000 and is fair under the circumstances, given Plaintiff's vigorous representation

22   of the proposed Class and efforts in prosecuting this case. Regardless, service awards —also

23   called incentive payments — to class representatives "do not, by themselves, create an

24   impermissible conflict between class members and their representatives." *In re Online DVD*

25   *Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2016) (finding district court did not abuse its

26   discretion in awarding $5,000 incentive award where class members received $12 individual

27

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 11
Case No. 3:16-cv-05486-JCS

awards) (citing cases). For purposes of determining a class representative's adequacy, the relevant inquiry is whether the plaintiff maintains "a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *Id.* (quoting *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978)). Here, Plaintiff, who has participated fully in this action at every turn, including sitting for deposition, has demonstrated a strong interest in prosecuting the Class claims and will do so regardless of the amount of any service award the Court approves.

2.      The Class satisfies the requirements of Rule 23(b)(3).

Class certification is appropriate under Rule 23(b)(3) when "questions of law or fact common to the members of the class predominate over any question affecting only individual members, and … a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Both requirements are satisfied in this case.

Common questions predominate over any questions affecting only individual members. The overarching common question is whether Pivotal is vicariously liable for the calls placed by EPLJ and Mr. Rose. This question can be resolved using the same evidence for all Class members and is exactly the kind of predominant common issue that makes certification appropriate. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) ….'" (citation omitted)). The other elements of Plaintiff's claims will also be proven with common evidence, including whether EPLJ and Mr. Rose used an automatic telephone dialing system or a pre-recorded message to place calls to cell phones, and whether Pivotal or EPLJ and Mr. Rose acted willfully. Because of the numerous common issues that typically predominate over individual issues, courts routinely certify TCPA claims. *See, e.g., Ikuseghan v. Multicare Health System*, No. C14-5539 BHS, 2015 WL 4600818, at *8 (W.D. Wash. July 29, 2015); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 400 (M.D.N.C. 2015); *Booth v. Appstack, Inc.*, No. C13-1533 JLR, 2015 WL 1466247, at

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 12
Case No. 3:16-cv-05486-JCS

*13 (W.D. Wash. Mar. 30, 2015); *Bee, Denning, Inc. v. Capital Alliance Group*, 310 F.R.D. 614, 630 (S.D. Cal. 2015).

Class certification is also "superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Classwide resolution is the only practical method of addressing the alleged telemarketing violations at issue in this case. There are millions of Class members with modest individual claims, most of which likely lack the resources necessary to seek individual legal redress. *See Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (cases involving "multiple claims for relatively small individual sums" are particularly well suited to class treatment); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."); *Agne*, 286 F.R.D. at 571 ("Five hundred dollars is not sufficient to compensate the average consumer for the time and effort that would be involved in bringing a small claims action ...."); *Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015) ("In the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions").

**B.     The proposed settlement should be preliminarily approved**

The settlement requires Pivotal to pay $9,000,000 into a non-reversionary "Settlement Fund." Murray Decl., Ex. 1 § 1.18. Each person who submits a valid claim form receives a share of the Settlement Fund after settlement costs are deducted ("Net Settlement Fund"). *Id.* § 11.2. The parties originally agreed that each claimant would receive the same pro rata share of the settlement regardless of the number of calls the claimant received. ECF No. 71-1 § 11.2. To address one of the concerns the Court raised at the December preliminary approval hearing, the parties have revised the settlement's plan for allocating the Net Settlement Fund to factor in the number of calls each claimant received as set forth in the calling records obtained during the

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 13
Case No. 3:16-cv-05486-JCS

1  litigation. Pursuant to the Amended Settlement, each Class member will receive a share of the

2  Net Settlement Fund based on the following formula: Net Settlement Fund **divided by** the total

3  calls received by Class members that submit timely and valid claim forms as set forth in calling

4  records obtained in this litigation **multiplied by** the total calls received by each Participating

5  Class Member. Murray Decl., Ex. 1 § 11.2. Using this new formula, and assuming a 10% claims

6  rate, Plaintiff's counsel estimate that a claimant who received the average six calls will receive

7  $28. *Id.* If 5% of the calls are claimed, a Class member who received six calls will receive

8  approximately $56. *Id.*

9         Plaintiff explained in its original motion for preliminary approval how each of the

10  factors outlined by the Ninth Circuit in *Hanlon* and *Churchill Village*—apart from the reaction of

11  Class members, since they have yet to be notified—support preliminary approval. *See* ECF No.

12  70 at 13:16–20:10. However, at the December preliminary approval hearing, the Court expressed

13  concern that the $9,000,000 settlement amount represented only a small fraction of the damages

14  that Class members could theoretically recover if they pursued the case to trial and won. *See* 47

15  U.S.C. § 227(b)(3)(B) (permitting $500 in statutory damages for each violation of the TCPA); 47

16  U.S.C. § 227(b)(3)(C) (permitting $1,500 for "willful" TCPA violations). The Court therefore

17  instructed the parties to provide (1) additional evidence that ████████████████████████

18  ████████████████████████ and (2) further explanation as to why Pivotal's

19  defenses justified the settlement amount. Murray Decl., Ex. 2 at 2:20–3:23. Pursuant to the

20  Court's direction, Plaintiff provides the following additional information showing that the

21  settlement amount is fair, reasonable, and adequate given the circumstances present here.

22        1.  ████████████████████████████

23        Evidence that a defendant could not pay a larger settlement or judgment amount supports

24  settlement approval. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1295 (9th Cir. 1992)

25  (one factor courts consider when evaluating a settlement is whether the defendant can pay a large

26  judgment or even a larger settlement); *see also Dakota Med., Inc. v. RehabCare Group, Inc.*, No.

27

1:14-cv-02081-DAD-BAM, 2017 WL 4180497, at *5 (E.D. Cal. Sept. 201, 2017) (approving $25 million TCPA settlement in part because potential $1.2 billion liability would have been "difficult to collect"); *Rinky Dink, Inc. v. World Business Lenders, LLC*, Case No. C14-0268-JCC, 2016 WL 3087073, at *2 (W.D. Wash. May 31, 2016) (approving settlement providing class members a fraction of their statutory damages where class counsel had reviewed financial documents before concluding that defendants could not pay a larger settlement amount). Even in cases involving large, publicly-traded financial institutions courts have approved settlements providing a fraction of the statutory damages available under the TCPA in part because a liability judgment would bankrupt the defendant and be impossible to collect. *See, e.g., Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016) (approving TCPA settlement that provided estimated awards of $52.50 and noting that "complete victory for Plaintiffs at $500 or $1,500 per class member could bankrupt Chase"); *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) (approving TCPA settlement providing an estimated $34.60 per claimant where Capital One's exposure was a minimum $950 billion and thus "complete victory would most surely bankrupt the prospective judgment debtor").

Here, Pivotal faced a potential judgment of $5,796,836,000 if it lost at trial (11,593,672 calls x $500 per call). Murray Decl. ¶ 10. With trebling, Pivotal's exposure would have exceeded $17.4 billion. *Id.* Plaintiff did not overlook or forget about these numbers but rather was upfront about them in its prior motion for preliminary approval. ECF No. 70 at 16:12–14. Nevertheless, the reality is Pivotal could not pay such a judgment or anything even remotely close to it. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

1      ██████████████ The Amended Settlement Agreement provides Class members with cash

2 payments now. In contrast, if Plaintiff had pursued litigation it risked obtaining a judgment that it

3 would not be able to collect. At a minimum, any payout almost certainly would have been

4 delayed for potentially years in supplemental proceedings ████████████████████████

5 ████████████████████████████.

6        2.   <u>Plaintiff faced the serious risk that it would lose on the merits.</u>

7      Pivotal insists that it cannot be held liable for the calls made by EPLJ and Mr. Rose

8 because it did not place the calls itself. Pivotal also asserts that it cannot be held vicariously

9 liable because it did not know that EPLJ and Mr. Rose were violating the TCPA. Plaintiff, on the

10 other hand, believes that Pivotal can be held vicariously liable for the calls at issue in this case

11 under common law agency theories. *See id.* at 3. But Plaintiff faced serious risk that this Court

12 would agree with Pivotal's view of the case. In fact, the Ninth Circuit recently affirmed summary

13 dismissal of two TCPA cases finding that the defendants could not be held vicariously liable for

14 telemarketing calls placed by third-parties. *See Jones v. Royal Admin. Servs. Inc.*, 866 F.3d 1100

15 (9th Cir. 2017) and *Kristensen v. Credit Payment Servs., Inc.*, --- F.3d ---, 2018 WL 343758 (9th

16 Cir. Jan. 10, 2018).

17      *Jones*, which issued just a few weeks before the parties' mediation, involved a company,

18 Royal Administration Services, Inc., that sells vehicle service contracts through automobile

19 dealers and about twenty marketing vendors. *Jones*, 866 F.3d at 1103. Plaintiffs alleged that one

20 vendor, AAAP, used an automated telephone dialing system to place calls to their cellular

21 telephone numbers that were registered on the national do-not-call list. *Id.* at 1103–04. AAAP's

22 business model involved calling potential customers and pitching them the "concept" of a

23 vehicle service contract. *Id.* at 1103. If a customer expressed interest, AAAP would pick a

24 service contract from the many it sold to sell to the consumer. *Id.*

25      Royal and AAAP entered into a marketing agreement that set forth certain authorized

26 sales and marketing methodologies to which AAAP was required to comply. *Id.* at 1103. The

27

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 16
Case No. 3:16-cv-05486-JCS

agreement prohibited AAAP from using methodologies that violate the TCPA. *Id.* The plaintiffs alleged that Royal was vicariously liable for AAAP's calls because AAAP was Royal's agent. *Id.* at 1104. The district court and the Ninth Circuit disagreed, finding on summary judgment that AAAP was an independent contractor rather than Royal's agent and thus could not be held vicariously liable for AAAP's unlawful conduct. *Id.* at 1104, 1108.

In determining that AAAP was an independent contractor rather than Royal's agent, the Ninth Circuit adopted the ten-factor test set forth in the Restatement (Second) of Agency § 220(2). The factors included (1) the control exerted by the employer, (2) whether the one employed is engaged in a distinct occupation, (3) whether the work is normally done under the supervision of an employer, (4) the skill required, (5) whether the employer supplies tools and instrumentalities [and the place of work], (6) the length of time employed, (7) whether payment is by time or by the job, (8) whether the work is in the regular business of the employer, (9) the subjective intent of the parties, and (10) whether the employer is or is not in business. *See Jones*, 866 F.3d at 1106. The court found particularly relevant the fact that Royal "did not have any control over the call until the telemarketer decided to pitch a Royal [service contract] to the consumer." *Id.* at 1106. Because AAAP sold VSCs for multiple companies, all of which presumably had their own telemarketing compliance requirements, Royal "did not have control over the sales pitch." *Id.* at 1107. The Ninth Circuit also found that AAAP was an independent business not supervised by Royal and provided many of its own tools and instrumentalities. *Id.* The contract between AAAP and Royal also was limited to a specific time frame and thus the "designated impermanency of the relationship" supported a finding that AAAP was an independent contractor. *Id.*

Plaintiff believes that this case is distinguishable from *Jones* for various reasons. But Plaintiff is aware that this Court could find otherwise given that there are some similarities between the present action and *Jones*. For example, the contract between EPLJ and Pivotal contemplates that EPLJ would be responsible for complying with the TCPA and FCC

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 17
Case No. 3:16-cv-05486-JCS

regulations. *Id.* EPLJ is a separate business from Pivotal and had its own dialing equipment and employees. EPLJ did not mention Pivotal during the unlawful calls, but instead screened the calls to determine whether the consumer was interested in payment processing services. On these facts, the Court could find that Pivotal "did not specifically control the calls at issue in this case" and that EPLJ was an independent contractor rather than an agent. *See Jones*, 866 F.3d at 1108.

The Ninth Circuit's decision in *Kristensen*, which was issued in January of this year, also creates serious risk for Plaintiff. *Kristensen* involved a consumer that received a text message advertising payday lending services. The lenders had entered into agreements with a company, LeadPile LLC, that buys and sells customer leads. LeadPile in turn contracted with a company, Click Media, that used leads from thousands of lead generators. One of those lead generators was AC Referral, which purchased lead lists and loaded them into a program that sent out text message advertisements. The issue before the Ninth Circuit was whether the defendants "ratified AC Referral's unlawful texting by accepting the benefits of the text messages sent by AC Referral while unreasonably failing to investigate its texting methods." *Kristensen*, 2018 WL 343758, at *2.

The Ninth Circuit affirmed the district court's determination that the defendants could not be held liable for AC Referral's calls. With respect to the lender defendants and LeadPile, the Ninth Circuit found that they were not agents of AC Referral because they never contracted or communicated with AC Referral. Because they were not agents, they could not have ratified AC Referral's conduct. *See Kristensen*, 2018 WL 343758, at *2 (noting "when an actor is not an agent and does not purport to be one, the doctrine of ratification does not apply") (quoting Restatement (Third) of Agency § 4.03 cmt. b) (internal marks omitted). As for Click Media, the Ninth Circuit affirmed the district court's determination that Click Media and AC Referral did have an agency relationship. However, the Court found that Click Media could not be liable for AC Referral's calls because the plaintiff presented no evidence that Click Media had actual knowledge that AC Referral was sending text messages in violation of the TCPA nor did

1  plaintiff "present evidence that Click Media had knowledge of facts that would have led a

2  reasonable person to investigate further, but ratified AC Referral's acts anyway without

3  investigation." *Id.* (quoting Restatement (Third) of Agency § 4.06 cmt. d) (internal marks

4  omitted).

5          Plaintiff believes that this case is distinguishable from *Kristensen* based on its view that

6  Mr. Rose's deposition testimony indicates that Pivotal knew EPLJ was violating the TCPA and

7  still accepted the leads. However, Pivotal contends that Mr. Rose's testimony does not support

8  Plaintiff's interpretation and that Pivotal could not possibly have known of EPLJ's alleged

9  TCPA violations because, among other things, Rose testified that EPLJ contractually agreed to

10  comply with the TCPA, that he provided verbal assurances to Pivotal that EPLJ would comply

11  with the TCPA and that EPLJ did, in fact, comply with the TCPA.  Pivotal also maintains that, if

12  his testimony supported Plaintiff's interpretation, Mr. Rose is not a credible witness. In addition,

13  the EPLJ calling campaign lasted for a relatively short period of time. Thus, Plaintiff had to

14  acknowledge that the Court could find that Pivotal did not know about the violations for the bulk

15  of the campaign and fired EPLJ once it allegedly learned that EPLJ was violating the TCPA.

16  Pivotal believed so strongly in its vicarious liability defense that its litigation plan was to move

17  for summary judgment on that issue.

18          The only reason the parties could settle the present action was through both sides

19  evaluating the potential risks of continued litigation and the hard work of Bruce Friedman of

20  JAMS. Indeed, the parties participated in a full-day mediation session before Mr. Friedman. ECF

21  No. 71 ¶ 17. The parties submitted detailed mediation briefs to Mr. Friedman in advance of the

22  mediation, setting forth their respective views on the strengths of their cases. Murray Decl. ¶ 4.

23  During the mediation session, the parties then discussed their relative views of the law and the

24  facts and potential relief for the proposed Class. *Id.* Counsel exchanged a series of

25  counterproposals on key aspects of the settlement. *Id.* At all times, the parties' settlement

26  negotiations were highly adversarial, non-collusive, and at arm's length. *Id.* At the end of the

27

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 19
Case No. 3:16-cv-05486-JCS

1  day, the parties determined that they fundamentally disagreed about the strengths of Plaintiff's

2  case. *Id.* Following mediation, Mr. Friedman continued to discuss potential resolution but faced

3  resistance from both parties until, ultimately, they reached agreement. *Id.* Without Mr.

4  Friedman's intervention, it is unlikely the parties would have settled. *Id.*

5      Due to uncertainties such as those outlined above, courts caution that a proposed

6  settlement "[should] not to be judged against a hypothetical or speculative measure of what

7  might have been achieved by the negotiators" because "the very essence of a settlement is

8  compromise, a yielding of absolutes and an abandoning of highest hopes." *Linney v. Cellular*

9  *Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (citations omitted). Indeed, "it is the very

10  uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that

11  induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City and Cnty.*, 688

12  F.2d 615, 625 (9th Cir. 1982). Due to the risk Plaintiff faced at summary judgment and trial,

13  Plaintiff and its counsel were willing to accept $9,000,000 — which amounts to approximately

14  $4.70 per Class member —to settle the Class claims. This settlement amount is in line with (and

15  in fact superior to numerous) other TCPA settlements throughout the country, including a long

16  list of cases approved by district courts in California. *See Adams v. AllianceOne Receivables*

17  *Mgt., Inc.*, No. 3:08-cv-00248, ECF Nos. 137 & 109 at 10–11 (S.D. Cal.) ($9,000,000/6,079,411

18  = $1.48 per class member); *Arthur v. Sallie Mae, Inc.*, No. 2:10-cv-00198, ECF Nos. 266 & 219

19  at 13 & 259 at 3 (W.D. Wash.) ($24,150,000/7,792,256 = $3.10 per class member); *Bayat v.*

20  *Bank of the West*, No. 13-cv-2376, ECF Nos. 72 at 2 & 64 at 3 (N.D. Cal.) ($3,354,746/871,836

21  = $3.85 per class member); *Couser v. Comenity Bank*, No. 12-cv-2484, ECF No. 91 at 5, 11

22  (S.D. Cal.) ($8,475,000/$3,982,645 = $2.13 per class member); *Franklin v. Wells Fargo Bank*,

23  No. 14-cv-2349, ECF No. 47 at 4 (S.D. Cal.) ($13,859,103.80/4,074,207 = $3.78 per class

24  member); *Kramer v. Autobytel, Inc.*, No. 4:10-cv-02722, ECF Nos. 148 at 7 & 137-5 at 18 (N.D.

25  Cal.) ($12,200,000/47,000,000 = $0.26 per class member); *Kwan v. Clearwire Corp.*, No. 2:09-

26  cv-01392, ECF Nos. 201 & 190 at 5 & 184 at 6  (W.D. Wash.) ($6,300,000/1,800,000 = $3.50

27

per class member); *Malta v. Freddie Mac & Wells Fargo Home Mtg.*, No. 3:10-cv-01290, ECF No. 91 at 6 & 60-1 at 8 (S.D. Cal.) ($17,100,000/4,337,960 = $3.94 per class member); *Sarabri v. Weltman, Weinberg & Reis Co.*, L.P.A. No. 3:10-cv-01777-AJB-NLS, ECF Nos. 24 at 2 & 28 at 6 (S.D. Cal.) ($525,000/618,417 = $0.85 per class member); *Steinfeld v. Discover Fin. Servs.*, No. 3:12-cv-01118-JSW, ECF No. 65 at 7, 15 (N.D. Cal.) ($8,700,000/6,016,032 = $1.45 per class member); *Rose v. Bank of Am.*, No. 5:12-cv-4009-EJD, ECF No. 59 at 8, 9 (N.D. Cal.) ($32,083,905/7,723,860 = $4.15 per class member);[2] *see also* Murray Decl. ¶ 12.

**C.       The claims process is necessary under the circumstances.**

The Amended Settlement provides for a simple claims process through which Class members can submit claims either online through Epiq's secure settlement website or by U.S. Mail. Murray Decl., Ex. 1 at Ex. 1. Submitting a claim requires minimal effort. The Class member only needs to enter his, her, or its name, physical address, email address, contact telephone number, the telephone number at which the Class member received the call, and the Class member's signature. *Id.*

At the preliminary approval hearing, the Court questioned whether the claims procedure exposed the Class to fraudulent claims. Murray Decl., Ex. 2 at 10:15–20 ("You can't just have something on the internet that anybody can fill out and send … because anybody can do it."). It does not. Class members may submit a claim only by entering the Claim Identification Number located on the postcard mailed to the Class member or by entering the telephone number at which the Class member received the calls at issue in this case. Azari Decl. ¶ 17 & Attachment 2. If the telephone number does not match the telephone number in the calling records, the claim will be denied. *Id.* In Epiq's experience, this process effectively prevents fraudulent claims. *Id.* ¶ 18. As a further check, Epiq has the right to reasonably request information from any Class member. Murray Decl., Ex. 1 at § 5.4; Azari Decl. ¶ 19. The proposed claim form requires the Class member to specifically agree that he or she will not object to a request for additional

---

[2] Pin cites are to the page numbers indicated in the ECF header.

information to verify the Class member's claim. Murray Decl., Ex. 1 at Ex. 1. It also requires the Class member to declare that he or she has accurately filled out the claim form. *Id.* Epiq routinely audits claim forms for indicia of fraud. *See* Azari Decl. ¶ 19. In Epiq's experience, such audits effectively deter attempts to file fraudulent claims. *Id.*

At the December hearing, the Court also questioned whether the claims process is necessary. Murray Decl., Ex. 2 at 15:23–16:10. It is for several reasons. First, a claims process prevents fraudulent claims because it requires the person receiving the notice to verify his or her identity and confirm that he or she should receive payment. This is not an employment case where the defendant has verified payroll records containing the names, addresses, and social security numbers of all Class members. On the contrary, Pivotal has no records of the allegedly unlawful calls at issue because it did not make them and maintains that it has no responsibility for them.

This also is not a case where class certification notice already has been successfully sent. *Cf. Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 20ll WL 1627973, at *11–12 (N.D. Cal. Apr. 29, 2011) (acknowledging the defendant's legitimate concerns about mailing checks to class members without a claims process, but concluding there were fewer risks because (1) the Court had certified the case as a class action, (2) three mailings already had been sent to class members, and (3) the last mailing had successfully reached 98% of class members); *Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333, slip. op. at 5–6 (M.D. N.C. Jan. 25, 2018) (entering judgment after trial in favor of 191 TCPA class members who had been fully identified and reserving judgment for class members who had not been fully identified, finding "[a] claims process for these persons is more appropriate").

Plaintiff and Epiq have obtained contact information associated with the telephone numbers that were called and matched those telephone numbers to that contact information. Epiq is confident that the matching process is generally accurate, but acknowledges that the names and addresses have not been verified. Azari Decl. ¶ 22. This case is similar to *In re Uber FCRA*

1  *Litigation*, Case No. 14-cv-05200-EMC, 2017 WL 2806698, at *8 (N.D. Cal. June 29, 2017)

2  where the court found a claims process necessary even though the defendant had contact

3  information for all potential class members because the contact information was not "verifiably

4  current." *Id.*  A claims process ensures that settlement funds are not sent out before this

5  verification has occurred. It would be inefficient, counterproductive, and potentially harmful to

6  Class members to direct mail checks without a claims process to verify that the contact

7  information is reliable. As one court put it:

> The Court-appointed disbursing agent testified that, without a claims process, the
> chances of fraud increased. Recovering money from individuals who fraudulently
> cashed settlement checks requires significant time and effort from the disbursing
> agent at the expense of the settlement fund. The Special Master further testified
> that sending unsolicited checks to unverified addresses can end up 'cost[ing] a ton
> of money.' In such situations, administrators 'get to the point where you never
> close the case.' …. For these reasons, the notice administrator, the Court-
> appointed disbursing agent, and the Special Master agreed that the expedited
> claims process was a relatively simple administrative device designed to lower
> costs without unduly burdening the claimants. The only cost to the class members
> of the process is the requirement that participants complete a one-page, check-the-
> box form, and the benefit is greater accountability and reduced long-term
> administrative expenses.

16  *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12*, MDL No.

17  1643, 2006 WL 3332829, at *2 (E.D. La. Nov. 15, 2006); *see also Braynen v. Nationstar Mortg.,*

18  *LLC*, No. 14-CV-20726, 2015 WL 6872519, at *14 (S.D. Fla. Nov. 9, 2015 ("A direct payment

19  structure without the Claim Form providing current addresses risks fraud and waste in

20  administering the Settlement.").

21      Second, simply sending checks to Class members would add more than a million dollars

22  to the anticipated cost of the notice program. Azari Decl. ¶ 21 (noting the cost of administration

23  would increase from $1,231,675 to $2,241,000). The increased cost is primarily due to the

24  increased printing and postage costs associated with mailing checks to approximately 1,571,982

25  identified Class members rather than the approximately 157,198 Class members that Epiq

26  estimates will file claims. *Id.* In addition, in Epiq's experience, a very small number of people

27

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 23
Case No. 3:16-cv-05486-JCS

1  bother to cash checks with amounts under $5.00. *Id.* In this case, Epiq estimates that only 40% of

2  the check recipients would cash their checks, which would average under $3.00. *Id.* ¶ 23. Under

3  the terms of the Settlement Agreement, this creates further additional costs because any uncashed

4  checks must be redistributed to Class members who cashed their checks. Murray Decl., Ex. 1 §

5  11.3. Epiq estimates that the additional cost of printing and postage for the redistribution, which

6  would involve printing, processing, and mailing an additional 628,793 checks, would be almost

7  $400,000. Azari Decl. ¶ 23. And there is no guarantee that Class members would cash this

8  second round of checks, which again would be quite small.

9     During the December hearing, the Court asked whether a claims process that likely will

10  result in only 10% of the Class submitting claims disadvantaged the Class. *See* Murray Decl., Ex.

11  2 at 14:13–24. It does not. "[T]here is nothing inherently objectionable" about a claims-

12  submission process, especially where it ensures only verified class members can receive a check.

13  *Shames v. Hertz Corp.*, No. 07-cv-2174-MMA(WMC), 2012 WL 5392159, at *9 (S.D. Cal. Nov.

14  5, 2012) (overruling objection that the defendants knew who everyone in the class is and thus

15  could simply send everyone cash, noting that courts "routinely approve claims-made

16  settlements," and citing cases); *see also In re Online DVD*, 779 F.3d at 944–945 (approving

17  settlement where cash component was divided equally among claimants after settlement costs

18  were deducted); *Barani v. Wells Fargo Bank, N.A.*, No. 12-cv-2999-GPC (KSC), 2014 WL

19  1389329, at * (S.D. Cal. Apr. 9, 2014) (preliminarily approving settlement in TCPA case where

20  class members were identified through reverse lookups and the net settlement fund was to be

21  divided between settlement class members who submitted claims); *Rinky Dink, Inc. v. World

22  Business Lenders*, Case No. 14-0268-JCC, 2016 WL 4052588 at *8–9 (W.D. Wash. Feb. 3,

23  2016) (same); *Lemus v. H & R Block Enters. LLC*, No. C 09-3179 SI, 2012 WL 3638550, at *2–

24  3 (N.D. Cal. Aug. 22, 2012) (approving claims made settlement); *Milliron v. T-Mobile USA, Inc.*,

25  No. 08-cv-4149 (JLL), 2009 WL 3345762, at *6 (D.N.J. Sept. 10, 2009) ("the Court finds it

26  perfectly appropriate to require Class members to submit certain information proving that they

27

are entitled to collect the relief awarded"); *Rubin v. Assicurazioni Generali S.P.A.*, 290 F. App'x 376, 377 (2d Cir. 2008) (rejecting argument that class members "will not be compensated under the settlement [if] they have not filed claims").

Moreover, the claims submission process is not burdensome and includes mechanisms for encouraging claims. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 591 (N.D. Ill.) (observing that the proposed claim form was "not unduly burdensome, long, or complex" and the parties' "use of a settlement website and toll free number suggests that the claims process was designed to encourage—not discourage—the filing of claims"). And Pivotal's total monetary payment will be $9,000,000 regardless of the number of people who submit claims. Thus, there is no incentive for the parties to limit the number of claims submitted. *See id.* (finding it "unlikely" in a non-reversionary settlement "that the claims process is designed to limit the 'take rate' of the Class members").

In sum, the circumstances of this case — where verified contact information is lacking, and the cost of settlement distribution would increase substantially under a direct payment method — amply justify the claims process contemplated by the Amended Settlement Agreement.

**D.    The Amended Settlement is reasonable in light of Plaintiff's revised requested service award and Plaintiff counsel's request for fees and costs.**

Plaintiff and his counsel will submit further evidence and argument in support of Plaintiff's requested service award and Plaintiff's counsel's requested fees and costs when Plaintiff's counsel files their motion in support of attorneys' fees and service awards. Murray Decl. ¶ 1. That said, to address concerns the Court raised at the preliminary approval hearing, Plaintiff provides the following initial showing that Plaintiff's requested service award and Plaintiff counsel's contemplated fee request are reasonable and support preliminary approval.

1.    The requested service award is reasonable.

The parties have revised the Settlement Agreement to state that Plaintiff will request a service award of only $2,000. *See* Murray Decl., Ex. 1 at § 4.3. "Incentive awards … are fairly

1  typical in class action cases." *Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009).

2  Service awards "compensate class representatives for work done on behalf of the class, to make

3  up for financial or reputational risk undertaken in bringing the action, and, sometimes, to

4  recognize their willingness to act as a private attorney general." *Id.* at 958–59; *see also Cook v.*

5  *Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (recognizing that "because a named plaintiff is an

6  essential ingredient of any class action, an incentive award is appropriate if it is necessary to

7  induce an individual to participate in the suit"). Incentive awards in TCPA cases are routinely

8  approved.

9       Here, the proposed $2,000 service award is in line with awards approved in the Ninth

10 Circuit both in non-TCPA and TCPA cases. *Pelletz v. Weyerhaeuser Co.*, 592 F. Supp. 2d 1322,

11 1329–30 & n.9 (W.D. Wash. 2009)1329-30 & n.9 (approving $7,500 incentive awards where

12 named plaintiffs assisted Class Counsel, responded to discovery, and reviewed settlement terms,

13 and collecting decisions approving awards ranging from $5,000 to $40,000); *see also In re*

14 *Online DVD*, 779 F.3d at 942 (rejecting argument that a $5,000 incentive award created a

15 conflict of interest between named plaintiff and Class even where settlement provided for $12

16 individual awards); *Bayat v. Bank of the West*, No. 13-cv-2376, ECF No. 72 at 18:1–24 (N.D.

17 Cal.) (approving $2,000 incentive award in TCPA case); *Kramer v. Autobytel, Inc.*, No. 4:10-cv-

18 02722, ECF No. 148 at ¶ 17 (N.D. Cal.) (approving $10,000 incentive award in TCPA case);

19 *Steinfeld v. Discover Fin. Servs.*, No. 3:12-cv-01118-JSW, ESF No. 98 at 4 (N.D. Cal.)

20 (approving $2,000 incentive award in TCPA case where record shows plaintiff met with counsel

21 provided information, and reviewed documents and pleadings).

22       2.    Plaintiff counsel's request for 25% of the settlement fund is reasonable.

23       When counsel's efforts result in the creation of a common fund that benefits plaintiffs

24 and class members, counsel have an equitable right to be compensated from that fund for their

25 successful efforts in creating it. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)

26 ("lawyer who recovers a common fund…is entitled to a reasonable attorney's fee from the fund

27

1   as a whole"); *Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) (quoting *Van Gemert*); *In*

2   *re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("those who

3   benefit in the creation of a fund should share the wealth with the lawyers whose skill and effort

4   helped create it").

5          In common fund cases, "courts have discretion to employ either the lodestar method or

6   the percentage-of-recovery method." *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d

7   935, 942 (9th Cir. 2011). The lodestar method was developed primarily in the context of fee

8   shifting statutes. *Id.* at 941. In common fund cases where "the benefit to the class is easily

9   quantified," the simpler percentage-of-the-common-fund method is the predominant approach.

10  *Id.* at 942.

11         Here, Plaintiff's counsel anticipates requesting 25% of the $9,000,000 fund plus their

12  reasonable out-of-pocket costs. The requested attorneys' fees are reasonable under the

13  percentage method. In percentage-of-fund cases, 25% is the "benchmark" for a reasonable fee

14  award and district courts departing from this benchmark in a given case must explain the special

15  circumstances justifying the departure. *See In re Bluetooth*, 654 F.3d at 942–43 (finding courts

16  should adjust the benchmark percentage where awarding 25% of a mega fund "would yield

17  windfall profits for class counsel in light of the hours spent on the case"). In their fee petition,

18  Plaintiff's counsel will explain in detail why no departure from the benchmark is justified here.

19  This is not a "mega fund" case and Plaintiff's counsel do not seek a windfall. Without any

20  guarantee that they would ever be paid, Plaintiff's counsel litigated this case for over a year

21  before the parties reached a settlement. Plaintiff's counsel responded to dispositive motions,

22  conducted first and third-party discovery, took a key deposition of Mr. Rose, and defended

23  Plaintiff's principals' depositions. Murray Decl. ¶ 11. In their fee petition, Plaintiff's counsel will

24  provide the Court with detail regarding their lodestar and expenses. *Id.* This information will

25  show that Plaintiff seeks reasonable compensation for the work they performed and the result

26  they achieved on behalf of the Class. Finally, the Amended Settlement Agreement notes that the

27

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 27
Case No. 3:16-cv-05486-JCS

1   amount of fees and costs awarded to Plaintiff's Counsel is not a condition of the settlement.

2   Thus, even if the amounts were to be lowered (which Plaintiff respectfully submits should not be

3   the case), the settlement should still be approved.

4   **E.      The proposed notice plan should be approved.**

5           The federal rules provide that "[t]he court must direct notice in a reasonable manner to

6   all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). When the

7   class is certified under Rule 23(b)(3), the notice must also be the "best notice practicable under

8   the circumstances, including individual notice to all members who can be identified through

9   reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

10          The parties have agreed on a notice plan that will provide Class members with direct

11  mail notice of a postcard that describes the settlement and Class members' rights in plain English

12  and provides them with the settlement website and a toll-free number to obtain more

13  information. As discussed below, the notice plan satisfies the requirements of Rule 23 and due

14  process.

15          1.      <u>The settlement provides for the best method of notice practicable under the</u>

16                  <u>circumstances.</u>

17          The parties propose to mail a postcard notice by first-class mail to class members. Azari

18  Decl. ¶ 9–13. EPLJ produced associated names and addresses for approximately 526,000 of the

19  telephone numbers that appear on the calling records, and Epiq has performed reverse look-ups

20  on the remaining numbers. *Id.* ¶¶ 9–10. Epiq will perform additional lookups if preliminary

21  approval is granted. *Id.* ¶ 10. If a postcard notice is returned with a forwarding address, Epiq will

22  forward the notice to the updated address via first-class mail. *Id.* ¶ 12. If a postcard notice is

23  returned as undeliverable without a forwarding address, Epiq will perform a reasonable "skip

24  trace" search using the National Change of Address database to obtain an updated address and

25  forward the notice to the updated address via first-class mail. *Id.* Epiq conservatively estimates

26  that this direct notice program will reach more than 70% of Class members, which is within the

27  range for reach recommended by the Federal Judicial Center, and satisfies due process. *Id.*

1    Epiq will establish and maintain a settlement website with detailed information about

2  the settlement. Azari Decl. ¶ 14. The website address will be included in the postcard notice. *Id.*

3  Epiq will also establish a toll-free number that Class members can call to receive more detailed

4  information about the settlement. *Id.* Plaintiff believes this is the most effective way to alert

5  Class members to the existence of the settlement and convey detailed information about the

6  settlement. *See Schaffer v. Litton Loan Servicing, LP*, No. CV 05-07673 MMM (JCx), 2012 WL

7  10274679, at *8 (C.D. Cal. Nov. 13, 2012) (approving a similar postcard notice plan).

8    2.    <u>The proposed form of notice adequately informs Class members of the settlement</u>

9        <u>and their rights.</u>

10    The proposed postcard notice, attached as Exhibit 2 to the Amended Settlement

11  Agreement, together with the website notice, attached as Exhibit 3 to the Amended Settlement

12  Agreement, is "reasonably calculated, under all circumstances, to apprise interested parties of the

13  pendency of the action and afford them an opportunity to present their objections" and also

14  describes "the action and the plaintiffs' rights in it." *Hawthorne v. Umpqua Bank*, No. 11-cv-

15  6700-JST, 2014 WL 4602572, at *6 (N.D. Cal. Sept. 15, 2014) (quoting *Philips Petroleum Co. v.*

16  *Shutts*, 472 U.S. 797, 812 (1985)). The notice is written in plain English, and will include the

17  dates for class members to object to the settlement and the final approval hearing. *See Chavez v.*

18  *PHC Corp.*, No. 13-cv-01797-LHK, 2015 WL 581382, at *6 (N.D. Cal. Feb. 11, 2015) ("Notice

19  is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert

20  those with adverse viewpoints to investigate and to come forward and be heard.'" (citation

21  omitted)). According to Epiq, the notice plan represents the best notice practicable and satisfies

22  due process. Azari Decl. ¶ 24.

23  **F.    The schedule for final approval.**

24    The next steps in the settlement approval process are to schedule a final approval

25  hearing, notify Class members of the settlement and hearing, and provide Class members with

26

27

the opportunity to submit simple claim forms and any comments about the settlement. The

parties propose the following schedule for final approval of the settlement:

| Event | Date |
|-------|------|
| Notice deadline | 30 days after preliminary approval |
| Class Counsel to file motion for attorneys' fees | 60 days after notice is sent |
| Deadline for Class members to file claims, object, and request exclusion | 90 days after notice is sent |
| Class Counsel to file motion for final approval | 110 days after notice is sent |
| Final approval hearing | At least 175 days after preliminary approval order |

## IV.  CONCLUSION

Plaintiff respectfully renews its request that the Court enter an order that (1) certifies the

proposed Class for settlement purposes only; (2) grants preliminary approval of the proposed

settlement; (3) directs notice to be disseminated to Class members in the form and manner

proposed by the parties; (4) appoints Epiq to serve as the settlement administrator; and (5) sets a

schedule and hearing date for final approval of the settlement and related deadlines.

RESPECTFULLY SUBMITTED AND DATED this 9th day of February, 2018.

TERRELL MARSHALL LAW GROUP PLLC

By:  /s/ Jennifer Rust Murray, *Admitted Pro Hac Vice*
Beth E. Terrell, CSB #178181
Email:  bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email:  jmurray@terrellmarshall.com
Adrienne D. McEntee, *Admitted Pro Hac Vice*
Email:  amcentee@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Steven M. Tindall, SBN #187862

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Email: smt@classlawgroup.com
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

Edward A. Broderick
Email:  ted@broderick-law.com
Anthony I. Paronich, *Admitted Pro Hac Vice*
Email:  anthony@broderick-law.com
BRODERICK & PARONICH, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Matthew P. McCue
Email:  mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

*Attorneys for Plaintiff*

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 31
Case No. 3:16-cv-05486-JCS

CERTIFICATE OF SERVICE

I, Jennifer Rust Murray, hereby certify that on February 9, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Antony Buchignani, SBN #186528
Email: tbuchignani@tocounsel.com
Drew Hansen, SBN #218382
Email: dhansen@tocounsel.com
Amy Burke, SBN #276699
Email: aburke@tocounsel.com
THEODORA ORINGHER PC
1840 Century Park East, Suite 500
Los Angeles, California 90067-2120
Telephone: (310) 557-2009
Facsimile: (310) 551-0283

*Attorneys for Defendant*

DATED this 9th day of February, 2018.

TERRELL MARSHALL LAW GROUP PLLC


By:  /s/ Jennifer Rust Murray, *Admitted Pro Hac Vice*
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email: jmurray@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 8103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

*Attorneys for Plaintiff*

PLAINTIFF'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY
APPROVAL OF AMENDED CLASS ACTION SETTLEMENT - 32
Case No. 3:16-cv-05486-JCS