Steven M. Tindall, SBN #187862
Email: smt@classlawgroup.com
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700

Beth E. Terrell, SBN #178181
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email: jmurray@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603

[Additional Counsel Appear on Signature Page]

*Class Counsel*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABANTE ROOTER AND PLUMBING, INC., individually and on behalf of all others similarly situated,<br><br>                 Plaintiff,<br><br>   v.<br><br>PIVOTAL PAYMENTS INC., d/b/a/ CAPITAL PROCESSING NETWORK and CPN,<br><br>                 Defendant. | NO. 3:16-cv-05486-JCS<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND RESPONSE TO OBJECTIONS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>JURY TRIAL DEMAND<br><br>Complaint Filed: September 26, 2016<br><br>DATE:      October 5, 2018<br>TIME:      2:00 p.m.<br>LOCATION:  Courtroom G - 15th Floor |

1  TO:  DEFENDANT PIVOTAL PAYMENTS INC., d/b/a/ CAPITAL PROCESSING
2       NETWORK and CPN; AND
   TO:  THEIR ATTORNEYS OF RECORD:
3

4       PLEASE TAKE NOTICE that on October 5, 2018, at 2:00 p.m., in Courtroom G, 15th

5  Floor of the U.S. District Court for the Northern District of California, 450 Golden Gate Avenue,

6  San Francisco, California, 94102, Plaintiff will move for final approval of a class action

7  settlement.

8       This motion will be based on: this Notice of Motion, the following Memorandum of

9  Points and Authorities, the Declaration of Jennifer Rust Murray, the Declaration of Cameron R.

10  Azari; the records and file in this action; and on such other matter as may be presented before or

11  at the hearing of the motion.

**TABLE OF CONTENTS**

Page No.

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

       A.    Plaintiff's claims ................................................................................... 2

       B.    The litigation and settlement negotiations ........................................... 2

       C.    The first preliminary approval hearing ................................................ 3

       D.    The proposed settlement ...................................................................... 4

             1.    The proposed settlement class ..................................................... 4

             2.    The settlement fund..................................................................... 4

             3.    The release ................................................................................... 5

       E.    The Court's preliminary approval order ............................................... 5

III.   ISSUES TO BE DECIDED .................................................................................. 5

IV.    ARGUMENT AND AUTHORITY ...................................................................... 6

       A.    The settlement satisfies the criteria for final approval........................ 6

             1.    The strength of Plaintiff's case ................................................... 7

             2.    The risk, expense, complexity, and likely duration of further
                   litigation ..................................................................................... 9

             3.    The risk of maintaining class action status through trial .......... 9

             4.    The amount offered in settlement ............................................. 10

             5.    The extent of discovery completed and the stage of the
                   proceedings ............................................................................... 11

             6.    The presence of a government participant ............................... 12

             7.    The experience of counsel supports final approval.................. 12

        8.      Class members' reaction supports final approval ................................... 12

B.    The settlement is the product of arm's-length negotiations ............................ 14

C.    The notice program complied with Rule 23 and due process ......................... 14

D.    The Class should be finally certified for settlement purposes ....................... 16

E.    Class Counsel's request for an award of attorneys' fees should be granted .................. 17

F.    The two objectors offer no reason to deny final approval ............................... 17

        1.      Sufficiency of the settlement .............................................................. 19

        2.      As the Court previously recognized, it was appropriate to use a claims process.................................................................................................. 21

        3.      The requested attorneys' fees, which include umreimbursed costs, are reasonable ......................................................................................... 22

V.    CONCLUSION............................................................................................ 25

# TABLE OF AUTHORITIES

**Page No.**

## FEDERAL CASES

*Arthur* v. *Sallie Mae, Inc.*,
　　No. 10-cv-00198-JLR, 2012 WL 4076119 (W.D. Wash. Sept. 17, 2012) ..................... 24

*Bayat v. Bank of the West*,
　　No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ...................... 10, 23

*Betorina v. Randstad US, L.P.*,
　　No. 15-cv-03646-EMC, 2017 WL 1278758 (N.D. Cal. Apr. 6, 2017).......................... 14

*Boeing Co. v. Van Gemert*,
　　444 U.S. 472 (1980)........................................................................................................ 13

*Braynen v. Nationstar Mortg., LLC*,
　　No. 14-CV-20726, 2015 WL 6872519 (S.D. Fla. Nov. 9, 2015) ................................... 21

*Casey v. Citibank, N.A.*,
　　No. 12–cv–00820, 2014 WL 4120599 (N.D.N.Y. Aug.21, 2014).................................. 13

*Celano v. Marriott Int'l Inc.*,
　　242 F.R.D. 544 (N.D. Cal. 2007)................................................................................... 16

*Chavez v. PHC Corp.*,
　　No. 13-cv-01797-LHK, 2015 WL 581382 (N.D. Cal. Feb. 11, 2015) .......................... 15

*Class Plaintiffs v. City of Seattle*,
　　955 F.2d 1268 (9th Cir. 1992) ................................................................................... 9, 14

*Chambers v. Whirlpool Corp.*,
　　No. SA CV 11-1733 FMO, 2016 WL 9451360 (C.D. Cal. Aug. 12, 2016) ............. 18, 19

*Churchill Village, L.L.C. v. Gen. Elec.*,
　　361 F.3d 566 (9th Cir. 2004) ......................................................................................... 13

*Custom LED, LLC v. eBay, Inc.*,
　　No. 12-cv-00350-JST, 2014 WL 2916871 (N.D. Cal. June 24, 2014) ............................ 9

*Dyer v. Wells Fargo Bank, N.A.*,
　　No. 13-cv-02858-JST, 2014 WL 1900682 (N.D. Cal. May 12, 2014) .......................... 11

*Eastwood v. S. Farm Bureau Cas. Ins. Co.*,
No. 3:11-CV-3075, 2014 WL 4987421 (W.D. Ark. Oct. 7, 2014)................................22

*Estrada v. iYogi, Inc.*,
No. 2:13–01989 WBS CKD, 2015 WL 5895942 (E.D. Cal. Oct. 6, 2015)...................10

*Garber v. Office of Comm'r of Baseball*,
No. 12-cv-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017)...............1, 17, 18

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1988) ................................................................6, 11

*Hawthorne v. Umpqua Bank*,
No. 11-cv-6700-JST, 2014 WL 4602572 (N.D. Cal. Sept. 15, 2014) ...........................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
281 F.R.D. 531 (N.D. Cal. 2012)............................................................19

*In re Capital One Tel. Consumer Prot. Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015) ..........................................................10

*In re Gen. Elec. Co. Sec. Litig.*,
998 F. Supp. 2d 145 (S.D.N.Y. 2014).......................................................18

*In re High-Tech Emp. Antitrust Litig.*,
No. 11-cv-2509-LHK, 2013 WL 6328811 (N.D. Cal. Oct. 30, 2013)...........................14

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
Nos. 09-md-2087-BTM (KSC), 09-cv-1088-BTM (KSC), 2013 WL 5275618
(S.D. Cal. Sept. 17, 2013) ..................................................................19

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ..............................................................11

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ........................................................6, 13, 22

*In re Rite Aid Corp. Secs. Litig.*,
396 F.3d 294 (3d Cir. 2005).................................................................24

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) ..............................................................6

*In re Uber FCRA Litig*,
No. 14-cv-05200-EMC, 2017 WL 2806698 (N.D. Cal. June 29, 2017).................21, 22

*Jones v. Royal Admin. Servs. Inc.*,
    887 F.3d 443 (9th Cir. 2018) ........................................................ 7

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) ....................................................... 13

*Knight v. Red Door Salons, Inc.*,
    No. 08-01520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ............................. 12

*Kristensen v. Credit Payment Servs.*,
    12 F. Supp. 3d 1292 (D. Nev. 2014) ...................................... 16

*Kristensen v. Credit Payment Servs.*,
    879 F.3d 1010 (9th Cir. 2018) ......................................................... 7

*Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*,
    639 F. App'x. 880 (3d Cir. 2016) ................................................ 25

*Larsen v. Trader Joe's Co.*,
    No. 11-cv-06188, 2014 WL 3404531 (N.D. Cal. July 11, 2014) .................................. 22

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ......................................................... 17

*Michel v. WM Healthcare Solutions, Inc.*,
    No. 1:10-cv-638, 2014 WL 497031 (S.D. Ohio Feb. 7, 2014) ...................................... 24

*Malta v. Fed. Home Loan Mortg. Corp.*,
    No. 10-cv-1290-BEN-NLS, 2013 WL 12095060 (S.D. Cal. June 21, 2013) ................ 24

*Moore v. Verizon Commc'ns Inc.*,
    No. C 09–1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013) ........................... 13

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ................................................................. 14

*Naiman v. TranzVia LLC*,
    No. 17-cv-4813-PJH, 2017 WL 5992123 (N.D. Cal. Dec. 4, 2017) ............................... 8

*Nat'l Rural Telecomm'ns Coop. v. DirecTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ....................................................... 9

*Pelletz v. Weyerhaeuser Co.*,
    255 F.R.D. 537 (W.D. Wash. 2009) ................................................. 12

*Perez v. Asurion Corp.*,
    501 F. Supp. 2d 1360 (S.D. Fla. 2007) ........................................................... 13

*Perkins v. LinkedIn Corp.*,
    No. 13-CV-04303-LHK, 2016 WL 613255 (N.D. Cal. 2016)........................ 12

*Poertner v. Gillette Co.*,
    618 F. App'x 624 (11th Cir. 2015) .................................................................. 13

*Reickborn v. Velti PLC*,
    No. 13-cv-03889-WHO, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015) ............ 11

*Rinky Dink, Inc. v. World Business Lenders, LLC*,
    No. C14-0268-JCC, 2016 WL 3087073 (W.D. Wash. May 31, 2016) ............ 9

*Rodriguez v. Kraft Foods Grp., Inc.*,
    No. 1:14-cv-1137-LJO-EPG, 2016 WL 5844378 (E.D. Cal. Oct. 4, 2016) ................. 22

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...................................................................... 6, 9

*Rose v. Bank of Am. Corp.*,
    No. 5:11-cv-02390-EJD, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014)....................... 23

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. July 29, 2011) ............................................... 21

*Shames v. Hertz Corp.*,
    No. 07-cv-2174-MMA(WMC), 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012).............. 22

*Six Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ...................................................................... 23

*Tadepalli v. Uber Techs., Inc.*,
    No. 15-CV-04348-MEJ, 2016 WL 1622881 (N.D. Cal. Apr. 25, 2016) ....................... 12

*Torisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) ........................................................................... 21

*Touhey v. United States*,
    No. EDCV 08-01418-VAP (RCx), 2011 WL 3179036 (C.D. Cal. July 25, 2011) ........ 13

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016).................................................................................. 17

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AND RESPONSE TO OBJECTIONS;
MEMORANDUM OF POINTS AND AUTHORITIES - vi
CASE NO. 3:16-CV-05486-JCS

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................... 24, 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) .......................................................................... 25

*Whitaker v. Bennett Law, PLLC,*
    No. 13-3145, 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014) ............................ 16

## FEDERAL RULES

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................... 14

Fed. R. Civ. P. 23(e)(1) .................................................................................. 14

Fed. R. Civ. P. 23(e)(2) .................................................................................. 6

## OTHER AUTHORITIES

William B. Rubenstein, 4 Newberg on Class Actions § 13:45 (5th ed. 2018) .......................... 14

Alan Hirsch, et al., *Awarding Attorneys' Fees and Managing Fee Litigation*,
    82 (Federal Judicial Center 3d ed. 2015) ......................................... 24

Manual for Complex Litigation (Fourth) §§ 21.632–21.634 (2017) ........................... 6

William B. Rubenstein, *Why the Percentage Method?*, 2 Class Action Attorney
    Fee Digest 93 (March 2008) ........................................................ 24

## I.  INTRODUCTION

Plaintiff Abante Rooter and Plumbing, Inc. moves for final approval of the $9 million settlement with defendant Pivotal Payments Inc. The Court granted preliminary approval of the settlement on March 28, 2018. The Settlement Administrator, Epiq, mailed notice to class members, reaching approximately 95.2% of the class by first class mail. Class members have now had an opportunity to consider the settlement and choose whether to file a claim to receive a portion of the settlement fund or to opt out. A total of 37,970 class members filed valid claims and will receive approximately $22.73 per telemarketing call, resulting in an average payment of $143.91 if the settlement is approved. Forty-seven class members opted out and only two class members objected to the settlement. One objector is represented by lawyers who courts have characterized as "professional objectors" and are known for filing objections "in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off." *Garber v. Office of Comm'r of Baseball*, No. 12-cv-03704 (VEC), 2017 WL 752183, at *2 (S.D.N.Y. Feb. 27, 2017).

All the factors that courts consider support final approval of the settlement. Continued litigation is risky given the challenges Plaintiff faces in proving vicarious liability and may result in nothing at all for class members. The settlement ensures that class members are compensated without delay and eliminates the risk of loss at summary judgment or trial, as well as the very real possibility that Pivotal would not be able to pay a damages award given its financial condition. The parties devoted sufficient time to motion practice and discovery before negotiating the settlement to evaluate the strengths and weaknesses of their claims and defenses, and Class Counsel, who have successfully litigated many TCPA cases, fully support the settlement. That only two class members objected to the settlement, raising issues that had previously been identified by the Court and were addressed by the parties before the Court granted preliminary approval, further supports final approval of the settlement.

1    Plaintiff requests that the Court certify the settlement class for settlement purposes,

2    overrule the objections, and approve the settlement as fair, reasonable and adequate.

3                                    **II.  BACKGROUND**

4    **A.    Plaintiff's claims.**

5          Pivotal provides merchant processing services to businesses nationwide. Plaintiff alleges

6    that Pivotal hired EPLJ, a business operated by Gordon Rose, to make calls by automatic

7    telephone dialing system ("ATDS") to market its credit card processing services. The recipients

8    of these calls, including Plaintiff, did not consent to receive them. ECF No. 1 ¶¶ 20-21. Plaintiff

9    alleges he received multiple calls on its cell phones made by EPLJ on Pivotal's behalf. *Id.* ¶¶ 22-

10   72. Plaintiff never consented to receive the calls. *Id.* ¶¶ 73-74. Plaintiff filed a proposed class

11   action complaint on September 26, 2016, alleging that Pivotal violated the TCPA's prohibition

12   of calls to cell phones using an ATDS or artificial or prerecorded voice, that the persons and

13   entities who made the calls were acting on Pivotal's behalf, and that Pivotal and these persons

14   and entities acted knowingly or willfully. *Id.* ¶¶ 91-97. Plaintiff sought damages of $500 for

15   every illegal call and sought to treble those damages because of Pivotal's alleged knowing or

16   willful violations of the TCPA. *Id.*

17   **B.    The litigation and settlement negotiations.**

18         The parties litigated for a year before commencing settlement negotiations. After Plaintiff

19   defeated Pivotal's motion to dismiss, ECF No. 27, the parties engaged in targeted discovery.

20   Plaintiff served interrogatories and two sets of requests for production on Pivotal. Murray Decl.

21   ¶ 4. Plaintiff also pursued third-party discovery from the entity that placed the calls, EPLJ, and

22   its principal, Gordon Rose, obtaining calling records documenting the calls Plaintiff maintains

23   EPLJ placed on Pivotal's behalf. *Id.* ¶ 6. Pivotal, EPLJ, and Mr. Rose produced approximately

24   17,000 pages of documents, which Plaintiff's counsel reviewed and analyzed. *Id.* ¶¶ 4, 6.

25   Plaintiff's expert, Jeffrey Hansen, analyzed the calling data and determined that EPLJ made

26   11,593,672 autodialed calls to 1,902,283 unique cellular telephone numbers. *Id.* ¶ 8. Mr. Hansen

27

also opined that EPLJ had used an autodialer to place the calls. *Id.* Plaintiff responded to Pivotal's discovery requests and Pivotal deposed Plaintiff's principals. *Id.* ¶¶ 4, 7. Plaintiff deposed Mr. Rose. Pivotal's counsel attended the deposition and cross-examined Mr. Rose. *Id.* ¶ 6.

When Pivotal indicated that it planned to move for summary judgment as to its alleged vicarious liability for the calls made by EPLJ, the parties briefed the issue of whether Plaintiff should be able to file its motion for class certification first. ECF No. 55. The Court ruled that Pivotal could file its summary judgment motion, ECF No. 58, and the parties stipulated to a briefing schedule for summary judgment to be followed, if necessary, by a class certification hearing. ECF No. 60.

The parties mediated with Bruce Friedman, Esq. of JAMS on August 31, 2017. Mr. Friedman has extensive experience mediating TCPA cases, including cases involving vicarious liability allegations like this one. Murray Decl. ¶ 10. During the mediation, Pivotal told Plaintiff's counsel that it was uninsured and did not have the money to fund a large settlement. *Id.* Plaintiff's counsel did not take Pivotal's assertions at face value, demanding that Pivotal provide financial documentation supporting its assertions. *Id.*

The parties also submitted mediation briefs, detailing the strengths of their respective claims and defenses. Murray Decl. ¶ 11. Mr. Friedman challenged Plaintiff's counsel on the strength of Plaintiff's vicarious liability theory and emphasized the significant risk Plaintiff faced if it pursued litigation. *Id.* The parties exchanged proposals and counterproposals but could not resolve the dispute by the end of the day. *Id.* Following the full-day mediation, Mr. Friedman continued to work with the parties. After several follow-up calls, the parties reached an agreement in principle, but it took several additional weeks to hammer out the details. *Id.*

## C.    The first preliminary approval hearing.

On November 1, 2017, Plaintiff filed a motion for preliminary approval of the class action settlement it reached with Pivotal. *See* ECF No. 70. The Court held a hearing and denied

Plaintiff's motion without prejudice on December 1, 2017. ECF No. 78. During the hearing, the Court raised several issues concerning the proposed settlement: (1) whether the settlement amount was adequate in light of Pivotal's exposure; (2) whether a "claims-made" procedure was appropriate; (3) whether Class members who received more calls should receive a greater allocation of the settlement fund; (4) whether the requested service award was too high; and (5) whether the class definition should be limited to the calls placed by EPLJ and Mr. Rose.

**D.      The proposed settlement.**

Following the hearing, the parties renegotiated the settlement over the course of several weeks. Murray Decl. ¶ 13. The terms of the settlement are memorialized in the parties' Amended Class Action Settlement Agreement and Release of Claims, referred to as "SA." *Id.*, Ex. 1.

        1.      The proposed settlement class.

The settlement class is defined as:

> All individuals, entities and persons to whom: (a) EPLJ or Gordon Rose made one or more non-emergency telephone calls; (b) allegedly on Pivotal's behalf; (c) promoting credit card processing services, other services, or goods of any kind; (d) to their cellular telephone number; (e) through the use of an automatic telephone dialing system or an artificial or prerecorded voice; and (f) at any time in the period from April 15, 2016 up through and including September 2, 2016.

SA § 1.4. The proposed settlement class is limited to individuals to whom EPLJ and Mr. Rose placed calls in an attempt to generate new business for Pivotal. The class period commences on April 15, 2016, which is the date the contract between EPLJ and Pivotal was executed and ends on September 2, 2016, the approximate date Pivotal's relationship with EPLJ concluded.

        2.      The settlement fund.

The proposed settlement requires Pivotal to pay $9,000,000 to distribute to participating class members and to pay the attorneys' fee award, service award, and settlement administration costs. SA § 10.1. After payment of the attorneys' fee award, service award, and settlement administration costs approved by the Court, the settlement fund will be distributed to all class members who submit timely and valid claim forms using the following formula:

Net Settlement Fund (i.e., the Gross Settlement Payment less the Settlement Administration Expenses, the Fee Award and the Service Award) divided by the total calls received by Participating Class Members that submitted timely and valid Claim Forms as set forth in EPLJ's records multiplied by the total calls received by each Participating Class Member (NSF/total claimant calls x individual claimant's total calls = Individual Settlement Payment).

*See* SA § 11.2. This formula ensures that class members who allegedly received more calls will receive a larger payment and thus addresses the concern the Court raised at preliminary approval.

The settlement fund is non-reversionary. If the Court does not approve the full amount of the attorneys' fee award, service award, or settlement administration costs, the difference will be distributed to participating class members who submit a timely and valid claim form. SA §§ 3.1, 11.3. If funds remain due to uncashed checks, they will be disbursed to Consumer Federation of America, a charity dedicated to furthering the interests of consumers including preventing telemarketing abuse. Murray Decl. ¶ 14.

 3. <u>The release.</u>

In exchange for the benefits of the settlement, class members will release any legal claims that may arise from or relate to the facts alleged in the complaint. SA §§ 1.28, 9.1-9.2. Plaintiff will also release any claim it could have asserted in this lawsuit. SA § 9.3. However, class members are not releasing their right to pursue further payment from Mr. Rose and EPLJ.

**E. The Court's preliminary approval order.**

The Court granted preliminary approval of the settlement on March 28, 2018. The Court conditionally certified the class for settlement purposes only, appointed Epiq to serve as the Settlement Administrator, approved the proposed notice plan, established procedures for objecting to and opting out of the settlement, and set a final approval hearing. ECF No. 100.

**III. ISSUES TO BE DECIDED**

Whether the settlement class should be finally certified and the settlement should be approved as fair, reasonable and adequate.

# IV. ARGUMENT AND AUTHORITY

Settlements are favored, particularly in the class action context. *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) ("[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."). Courts recognize that a settlement approval hearing should not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009).

Proposed class action settlements are not effective unless approved by the Court. Fed. R. Civ. P. 23(e). There is a three-step procedure for approval of class action settlements: (1) preliminary approval of the settlement; (2) dissemination of notice of the settlement to class members; and (3) a "fairness hearing" at which class members may be heard and evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented. Manual for Complex Litigation (Fourth) §§ 21.632–21.634 (2017). The first two stages are complete. The Court must now determine whether the settlement is "fundamentally fair." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988). The Court must consider whether the settlement "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

## A. The settlement satisfies the criteria for final approval.

The Ninth Circuit has established a list of factors for courts to consider when evaluating whether a proposed settlement is fair, reasonable and adequate: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the benefits offered in the settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942, 944 (9th Cir. 2015). Each of these factors favor approval of the proposed settlement.

1.    The strength of Plaintiff's case.

Plaintiff believes it has a winnable case. Plaintiff obtained an affidavit from Mr. Rose stating that Pivotal approved a business plan authorizing EPLJ to use pre-recorded messages asking individuals if they were interested in Pivotal's payment processing and merchant account services products, and that the pre-recorded telemarketing campaign made calls using an automatic telephone dialing system. Murray Decl. ¶ 6. Mr. Rose stated that EPLJ made "cold calls" targeted at businesses and that EPLJ therefore did not have any evidence that any of the recipients of the calls consented to receiving the pre-recorded message. *Id.*

That said, Plaintiff faced a serious risk that it would lose on summary judgment, recovering nothing for the Class. The Ninth Circuit recently affirmed summary dismissal of two TCPA cases, finding that the defendants could not be held vicariously liable for telemarketing calls made by third parties. *See Jones v. Royal Admin. Servs. Inc.*, 887 F.3d 443 (9th Cir. 2018); *Kristensen v. Credit Payment Servs.*, 879 F.3d 1010 (9th Cir. 2018). In *Jones*, the Ninth Circuit held that a company could not be held liable for calls that a third-party telemarketer placed on a theory of "actual authority" unless the plaintiff presents evidence of a written or oral communication from the principal to the agent either telling the agent what to do or consistent with the principal's general statement of what the agent is supposed to do. *Jones*, 887 F.3d at 449. Pivotal adamantly asserts that it never authorized EPLJ to send prerecorded messages to cell phones. To the contrary, Pivotal maintains that its contract with EPLJ required EPLJ to be responsible for complying with the TCPA. ECF No. 95 at 17. Although the parties interpret this contractual provision differently, Plaintiff faced the real risk that the Court would side with Pivotal, resulting in dismissal of the case and zero recovery for the Class.

In *Kristensen*, the Ninth Circuit affirmed summary dismissal of a TCPA action where the plaintiff alleged that the defendant was liable for a lead generator's calls on a ratification theory. Ratification requires a principal to have knowledge of material facts about an agent's unlawful act, and nevertheless accept the benefits of that act. *Kristensen*, 879 F.3d at 1014. Knowledge of *legal* telemarketing activities does not suffice to establish ratification's knowledge element. *Id.* at

1015 (noting that "knowledge of otherwise commonplace marketing activity is not the sort of red flag that would lead a reasonable person to investigate whether the agent was engaging in unlawful activities"). Pivotal insists that it did not know EPLJ was violating the TCPA by placing prerecorded message calls to potential customers' cell phones. Pivotal says that Rose assured Pivotal that he was scrubbing for cell phones using proprietary technology. If the court accepts Pivotal's version of the facts, Plaintiff's ratification theory of liability would fail.

Mr. Rose's company was the telemarketer in another TCPA case where the court granted a motion to dismiss on vicarious liability grounds. *See Naiman v. TranzVia LLC*, No. 17-cv-4813-PJH, 2017 WL 5992123, at *1 (N.D. Cal. Dec. 4, 2017). In *Naiman*, the plaintiff sued a payment processing company similar to Pivotal for prerecorded calls allegedly placed in violation of the TCPA by Arris, another telemarketing company run by Mr. Rose. In dismissing the case, the court noted that the contract between the parties put Arris in sole control of the messages it sent to generate leads for TranzVia as well as the process that Arris used to audit the data before providing it TranzVia. *Naiman*, 2017 WL 5992123, at *13. The court also observed that the contract made Arris fully responsible for complying with the applicable law. While there are ways to distinguish this case, it further demonstrates the challenges in proving Pivotal's vicarious liability for its telemarketers' TCPA violations. *See* ECF No. 91 at 16-19 (discussing *Jones* and *Kristensen*); *see also* ECF No. 95 at 9-18 (discussion of vicarious liability in Pivotal's memorandum in support of preliminary approval).

Even if Plaintiff could overcome the pretrial risks that remain, it would still need to prevail at trial and, if successful, prevail on an inevitable appeal that could take several years. It is also unlikely that Pivotal could pay a judgment in the amount of its total liability. Pivotal faced a potential judgment of $5,796,836,000 if it lost at trial (11,593,672 calls x $500 per call). With trebling, Pivotal's exposure would have exceeded $17.4 billion. As discussed in Plaintiff's renewed motion for preliminary approval, there is a significant risk that Pivotal could not pay a judgment of this magnitude—or anything even remotely close to it. *See* ECF No. 91 at 14-16; *see*

*also* ECF No. 95 at 2. Evidence that a defendant cannot pay a larger settlement or judgment supports settlement approval. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1295 (9th Cir. 1992) (courts consider whether the defendant can pay a large judgment or a larger settlement); *see also Rinky Dink, Inc. v. World Business Lenders, LLC*, No. C14-0268-JCC, 2016 WL 3087073, at *2 (W.D. Wash. May 31, 2016) (approving settlement providing class members a fraction of their statutory damages because the defendants' financial condition meant "they are unable to pay a larger settlement amount").

2.     The risk, expense, complexity, and likely duration of further litigation.

Litigating this case to trial would be both expensive and risky. Discovery was still in process when the parties negotiated the settlement. Had litigation continued, Plaintiff would have to complete written discovery and depositions. Plaintiff had not yet moved for class certification, and would have had to prepare expert reports and other evidence to support the motion. Pivotal would likely move for summary judgment and might persuade the Court that it should not be held vicariously liable for the alleged telemarketing violations. If Plaintiff defeated Pivotal's summary judgment motion, it would then have had to move for class certification, which is discussed below. Assuming a class was certified, the next step would be trial. Trials are always inherently risky, and a victory may be short-lived when followed by an appeal.

The settlement provides prompt relief for class members and avoids the risk and expense of continued litigation. *See Rodriguez*, 563 F.3d at 966; *Nat'l Rural Telecomm'ns Coop. v. DirecTV, Inc*., 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("The Court shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.").

3.     The risk of maintaining class action status through trial.

Plaintiff has not yet moved for class certification. There is a risk that Plaintiff would not prevail or, if it did, that Pivotal might later succeed in moving to decertify. *See Custom LED, LLC v. eBay, Inc.*, No. 12-cv-00350-JST, 2014 WL 2916871, at *4 (N.D. Cal. June 24, 2014)

("[B]oth parties recognize that eBay will actively oppose certification of the class if the settlement is not approved. As such, the Court finds that the potential difficulties associated with obtaining class certification weigh in favor of approving the settlement."); *see also Bayat v. Bank of the West*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015) ("Indeed, courts have previously granted approval to TCPA class action settlements precisely because certification of such actions is a risky endeavor.").

        4.      The amount offered in settlement.

      The settlement appropriately balances the costs, risks, and likely delay of further litigation against the benefits provided. Pivotal has agreed to pay $9 million to settle Plaintiff's claims. The settlement fund will be used to pay the costs of notice and settlement administration, attorneys' fees and costs, and a service award to Plaintiff. Once these amounts are paid, the settlement fund will be distributed to all class members who submitted a valid claim form. If the Court awards the requested attorneys' fee and service award, the 37,970 class members who submitted a valid claim form will receive an average cash payment of $143.91, which amounts to $22.73 per phone call. Azari Decl. ¶ 25. These amounts equal or exceed similar settlement payments in other TCPA cases. *See Bayat*, 2015 WL 1744342, at *5 (collecting cases and approving settlement where each class member received approximately $151); *In re Capital One Tel. Consumer Prot. Act Litig. (In re Capital One)*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) (approving settlement where each class member received $34.60 per claimant); *Estrada v. iYogi, Inc.,* No. 2:13–01989 WBS CKD, 2015 WL 5895942, at *7 (E.D. Cal. Oct. 6, 2015) (granting preliminary approval to TCPA settlement where class members estimated to receive $40); *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118, Dkt. No. 96 at ¶ 6 (N.D. Cal. Mar. 10, 2014) (claimants received $46.98 each); *Adams v. AllianceOne Receivables Mgmt., Inc.*, No. 3:08-cv-00248-JAH-WVG, Dkt. No. 137 (S.D. Cal. Sept. 28, 2012) (claimants received $40 each); *Desai v. ADT Sec. Servs., Inc.,* Case No. 1:11-cv-01925 (Dkt. No. 229) (N.D. Ill. Feb. 14, 2013) (estimating claimants would receive between $50 and $100); *Rinky Dinky v. Elec. Merchant Sys.,*

*et al.*, No. C13-1347-JCC, Dkt. No. 151 (W.D. Wash. Apr. 19, 2016) (approving awards in a TCPA action of approximately $97 per class members).

The cash payments also compare favorably to the potential damages of $1,500 per class member, which puts Pivotal's total exposure at over $17 billion. The proposed settlement is reasonable and of fair value given the significant litigation risks Plaintiff faces in continuing to litigate. The amounts are also reasonable given the high litigation costs and fees that would likely engulf any amounts class members could recoup if they litigated their claims on an individual basis. The costs of obtaining discovery from Pivotal, hiring an expert to opine about whether the calling equipment constitutes an "ATDS" under the TCPA, and proving their entitlement to damages would quickly exceed any individual class member's potential recovery. The settlement is also fair and adequate given Pivotal's financial condition, which precludes it from paying a larger settlement. *See Reickborn v. Velti PLC*, No. 13-cv-03889-WHO, 2015 WL 468329, at *6 (N.D. Cal. Feb. 3, 2015) (finding the defendants' financial condition "highlights the reasonableness of the settlement amount").

The settlement provides class members with cash payments now and eliminates the risk of later payments at a reduced rate due to higher costs and losses in the course of litigation—and the risk of no payment at all. "The proposed settlement need not be ideal, but it must be fair and free of collusion, consistent with a plaintiff's fiduciary obligations to the class." *Dyer v. Wells Fargo Bank, N.A.*, No. 13-cv-02858-JST, 2014 WL 1900682, at *6 (N.D. Cal. May 12, 2014); *see also Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.").

     5.     <u>The extent of discovery completed and the stage of the proceedings.</u>

For this factor, courts look to whether the parties have sufficient information to make an informed decision with respect to the settlement. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). The parties briefed Pivotal's motion to dismiss, which the Court

resolved in Plaintiff's favor. They also engaged in sufficient discovery to have a solid understanding of the legal and factual issues in the case. Through written and document discovery of Pivotal and critical third-party discovery of EPLJ, Plaintiff developed an appreciation of the strengths and weaknesses of its claims.

6.     The presence of a government participant.

While no governmental entity is a party to this litigation, notice has been issued to numerous governmental agencies in compliance with the Class Action Fairness Act. Azari Decl. ¶¶ 10-11. No governmental entity has raised objections or concerns about the settlement.

7.     The experience of counsel supports final approval.

In considering a class settlement, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367, at *4 (N.D. Cal. Feb. 2, 2009); *see also Perkins v. LinkedIn Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *3 (N.D. Cal. 2016) ("[T]he views of Plaintiffs' counsel, who are experienced in litigating and settling complex consumer class actions, weigh in favor of final approval."). Class Counsel have extensive experience litigating TCPA class actions, consumer class actions, and other complex matters. *See* ECF Nos. 103 ¶¶ 26-33, 105 ¶¶ 27-31, 106 ¶¶ 16-20. They are well positioned to evaluate the settlement, having engaged in sufficient discovery and expert analysis to evaluate the strengths and weaknesses of Plaintiff's case. Class Counsel support the settlement as fair, reasonable and adequate. Murray Decl. ¶¶ 16-17.

8.     Class members' reaction supports final approval.

A positive class response to a settlement—as evidenced by a small percentage of opt outs and objections—supports final approval. *See Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 543-44 (W.D. Wash. 2009); *Tadepalli v. Uber Techs., Inc.*, No. 15-CV-04348-MEJ, 2016 WL 1622881, at *8 (N.D. Cal. Apr. 25, 2016) (observing that "the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members" (citation omitted)). Of

nearly 1.9 million class members—most of whom received direct notice of the settlement—only 47 chose to opt out and two objected. Azari Decl. ¶ 24. This response supports final approval of the settlement. *See, e.g., Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming district court's approval of class settlement with 45 objections and 500 opt outs for a class of approximately 90,000 notified class members).

A total of 37,970 class members filed valid claims, or approximately 2% of the class. Azari Decl. ¶ 25. While Plaintiff expected a larger number of claims to be filed, as one court explained, the number of claims made is "irrelevant to the underlying issue; to wit, whether the proposed settlement agreement is fair, reasonable, and adequate." *Casey v. Citibank, N.A.,* No. 12–cv–00820, 2014 WL 4120599, at *2 (N.D.N.Y. Aug.21, 2014). Courts have approved settlements with similar claims rates. *See, e.g., In re Online DVD*, 779 F.3d at 944-45 (affirming approval of settlement where 1,183,444 of 35 million class members—less than 3.4%—filed claims); *Poertner v. Gillette Co.*, 618 F. App'x 624, 625-26, 630-31 (11th Cir. 2015) (affirming approval of settlement where only 55,346 of 7.26 million class members—less than 1%—filed claims); *Moore v. Verizon Commc'ns Inc.,* No. C 09–1823 SBA, 2013 WL 4610764, at *8 (N.D. Cal. Aug. 28, 2013) (granting final approval of class action settlement with 3% claims rate); *Touhey v. United States*, No. EDCV 08-01418-VAP (RCx), 2011 WL 3179036, at *7-8 (C.D. Cal. July 25, 2011) (approving a settlement with a 2% claims rate); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377, 1384 (S.D. Fla. 2007) (approving settlement where 118,663 out of approximately 10.3 million class members submitted claims, for a claim rate of approximately 1.2 percent); *see also Keil v. Lopez*, 862 F.3d 685, 696-97 (8th Cir. 2017) ("a claim rate as low as 3 percent is hardly unusual in consumer class actions and does not suggest unfairness"). Even those class members who chose not to file a claim benefitted from the opportunity to do so. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980) ("Their right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel.").

**B.     The settlement is the product of arm's-length negotiations.**

"Before approving a class action settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties." *Class Plaintiffs*, 955 F.2d at 1290. When a settlement is the product of arm's-length negotiations conducted by capable and experienced counsel, the court begins with a presumption that the settlement is fair and reasonable. *See* William B. Rubenstein, 4 Newberg on Class Actions § 13:45 (5th ed. 2018); *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-2509-LHK, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013). This settlement is the product of arm's-length negotiations between the parties and their counsel, who are highly experienced in litigating these types of cases, and was negotiated with the assistance of an experienced and well-respected mediator. *See Betorina v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758, at *7 (N.D. Cal. Apr. 6, 2017) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

**C.     The notice program complied with Rule 23 and due process.**

The class notice program approved by the Court and implemented by Epiq satisfied the requirements of Rule 23 and due process. Rule 23 provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). When the class is certified under Rule 23(b)(3), the notice must also be the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). To comply with constitutional due process standards, the notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The Court approved the postcard notice in its preliminary approval order. ECF No. 100 at 4. The notice was "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" and

described "the action and the plaintiffs' rights in it." *Hawthorne v. Umpqua Bank*, No. 11-cv-6700-JST, 2014 WL 4602572, at *6 (N.D. Cal. Sept. 15, 2014) (quoting *Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)). The notice was written in plain English and included the dates for class members to object and the final approval hearing. *See Chavez v. PHC Corp.*, No. 13-cv-01797-LHK, 2015 WL 581382, at *6 (N.D. Cal. Feb. 11, 2015) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" (citation omitted)).

Epiq mailed the Court-approved postcard notice by first-class mail to 1,750,564 class members. Azari Decl. ¶ 14. EPLJ produced associated names and addresses for approximately 526,000 of the telephone numbers that appear on the calling records, and Epiq performed reverse look-ups on the remaining numbers. *Id.* ¶¶ 12-13. When postcards were returned as undeliverable without a forwarding address, Epiq used a third-party lookup service to find an updated address to re-send the postcard. *Id.* ¶ 16. As of August 28, 2018, only 92,125 postcard notices were returned as undeliverable for which Epiq was unable to obtain a more current address. *Id.* Epiq estimates that the notice program reached approximately 95.2% of class members. *Id.* ¶ 17.

Epiq established a settlement website with detailed information about the settlement. *Id.* ¶ 18. The website address was printed on all notices. *Id.* Located at https://pivotaltcpa.com/, the website had 81,811 unique visitors as of August 28, 2018. *Id.* ¶¶ 18, 20. The website lists important dates and class members' rights and options, included frequently asked questions and key documents from the case like the settlement agreement and motion for attorneys' fees, and allowed class members to submit an online claim. *Id.* ¶ 18-19. The long form notice was posted on the website, and also mailed to any class member who requested it. Azari Decl. ¶¶ 15, 18. The website (and notice) also provided a toll-free number that class members could call to reach a 24-hour automated phone system with recorded answers to frequently asked questions. *Id.* ¶ 21. The toll-free number had received 5,295 calls as of August 28, 2018. *Id.* Class members were

also able to call a different toll-free number to reach Class Counsel with any questions they had about the settlement. Class Counsel received approximately 1,450 calls and devoted nearly 200 hours to responding to class members' questions and concerns. Murray Decl. ¶ 17.

**D.    The Class should be finally certified for settlement purposes.**

In its Preliminary Approval Order, the Court provisionally certified the following Class for settlement purposes:

> All individuals, entities and persons to whom: (a) EPLJ or Gordon Rose made one or more non-emergency telephone calls; (b) allegedly on Pivotal's behalf; (c) promoting credit card processing services, other services, or goods of any kind; (d) to their cellular telephone number; (e) through the use of an automatic telephone dialing system or an artificial or prerecorded voice; and (f) at any time in the period from April 15, 2016 up through and including September 2, 2016.

ECF No. 100 at 2-3. Plaintiff demonstrated in its motion for preliminary approval that the Rule 23 requirements are satisfied:

- Numerosity is satisfied because the Class includes approximately 1.9 million people. *See Celano v. Marriott Int'l Inc.*, 242 F.R.D. 544, 548-49 (N.D. Cal. 2007).

- Commonality is satisfied because the central questions in this case—whether Pivotal is vicariously liable for calls made by EPLJ and whether the calls violated the TCPA—turn on common evidence and can be resolved for all Class members at one time. *See, e.g., Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014).

- Typicality is satisfied because Plaintiff's claims arise from the same course of alleged conduct by Pivotal and are based on the same legal theories as the Class's claims. *See Whitaker v. Bennett Law, PLLC,* No. 13-3145, 2014 WL 5454398, at *5 (S.D. Cal. Oct. 27, 2014).

- Adequacy is satisfied because Plaintiff has no conflicts of interest with other Class members, has demonstrated its commitment to the Class, and is represented by counsel who are experienced in litigating class action cases and TCPA claims in particular.

- Predominance is satisfied because the overarching common question of whether Pivotal is vicariously liable for the calls placed by EPLJ and Mr. Rose can be resolved using the same evidence for all Class members and is exactly the kind of predominant common issue that makes certification appropriate. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). The other elements of Plaintiff's claims can also be proven with common evidence, including whether EPLJ and Mr. Rose used an automatic telephone dialing system or a pre-recorded message to place calls to cell phones, and whether Pivotal or EPLJ and Mr. Rose acted willfully.

- Superiority is satisfied because classwide resolution is the only practical method of addressing the alleged telemarketing violations of millions of Class members with modest individual claims. *See Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001).

Plaintiff now requests that the Court finally certify the Class for settlement purposes.

**E.    Class Counsel's request for an award of attorneys' fees should be granted.**

Class Counsel filed a motion for an award of attorneys' fees and costs on May 25, 2018, requesting a fee at the Ninth Circuit's benchmark rate of 25% of the settlement fund, which amounts to $2,250,000 and includes Class Counsel's unreimbursed litigation costs. ECF No. 102. The motion also requests a $2,000 service payment for Plaintiff. For the reasons discussed in that motion, the request for attorneys' fees and a service payment should be granted.

**F.    The two objectors offer no reason to deny final approval.**

Only two class members objected to settlement: Bruce Ebneter and Nancy Hightower of Route 42 Dance Academy. ECF Nos. 111, 112, 125 (A third class member, Rich Baker of Rich Baker Plumbing, filed the postcard notice he received with the Court. ECF No. 110. Class Counsel left five voice mails for Mr. Baker but received no response. Murray Decl. ¶ 18.)

Ms. Hightower is represented by Timothy Hanigan and Christopher Bandas, who are "professional" objectors to class action settlements. *Garber v. Office of Comm'r of Baseball*, No.

12-cv-03704 (VEC), 2017 WL 752183, at *4 n.9 (S.D.N.Y. Feb. 27, 2017) ("Bandas appears to fall within a class of attorneys called "professional objectors." Professional objectors are attorneys who 'file stock objections to class action settlements'—objections that are '[m]ost often ... nonmeritorious'—and then are 'rewarded with a fee by class counsel to settle their objections." (alterations in original) (citation omitted)); *Chambers v. Whirlpool Corp.*, No. SA CV 11-1733 FMO, 2016 WL 9451360, at *1 & n.2 (C.D. Cal. Aug. 12, 2016) (objectors were represented by Hanigan and Bandas). Mr. Bandas states that he "does not presently intend on making an appearance for himself or his firm." ECF No. 112 at 4. This is apparently one of Mr. Bandas's usual tactics, as it previously prevented a court from sanctioning his conduct. *Garber*, 2017 WL 752183, at *5-6 (finding, where Bandas "refused to enter a notice of appearance in this case" and instead "orchestrated other attorneys … 'to appear' on the various filings that Bandas drafted or prepared behind the scenes," that the court did not have jurisdiction to sanction him even though these "machinations were designed to avoid his professional responsibilities to the Court" and there was "strong indicia of his bad faith"); *see also Chambers*, 2016 WL 9451360, at *1 n.2 (Bandas "does not presently intend on making an appearance for himself or his firm").

"[W]hen assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first." *Chambers*, 2016 WL 9451360, at *2 (citation omitted); *see also In re Gen. Elec. Co. Sec. Litig.*, 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014) (finding that an objector's "relationship with Bandas, a known vexatious appellant, further supports a finding that [the objector] brings this appeal in bad faith"). Numerous courts have concluded that Mr. Bandas's and Mr. Hanigan's objections lack merit because their motivation is to extract a fee rather than to improve the settlement for the benefit of the class. *See, e.g., Garber*, 2017 WL 752183, at *6 ("This court joins the other courts throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off.");

*Chambers*, 2016 WL 9451360, at *2 (finding "there is good cause to question whether Hanigan and Bandas have a motive other than putting the interest of the class members first"); *In re Hydroxycut Mktg. & Sales Practices Litig.,* Nos. 09-md-2087-BTM (KSC), 09-cv-1088-BTM (KSC), 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013) (striking objection after an evidentiary hearing because "Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away" and "was using the threat of questionable litigation to tie up the settlement unless the payment was made"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) ("Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct.").

The Court should overrule Ms. Hightower's objection. She is represented by two professional objectors, one of whom has employed his usual tactic of not entering an appearance to evade sanctions. The objection contributes nothing new to the Court's evaluation of the settlement because it merely raises issues previously identified by the Court and addressed by the parties before the Court granted preliminary approval of the settlement.

> 1.  Sufficiency of the settlement.

Both objectors challenge the sufficiency of the settlement. Mr. Ebneter says that he should receive "the amount of $1,200 … in damages" because 12 calls were made to his work number, tying up the line, and a busy signal may have led customers to call a competitor. ECF No. 111. Mr. Ebeneter is expected to receive a payment of approximately $272.76, which equates to $22.73 per call. Azari Decl. ¶ 25.

Ms. Hightower contends that the $9 million settlement fund is inadequate given Pivotal's potential exposure should Plaintiff prevail at trial on appeal. This is an issue the Court raised at the initial preliminary approval hearing. ECF No. 81 at 2:20-4:25. Ms. Hightower dismisses the challenges that Plaintiff faces in proving its TCPA claims, claiming that defendants will almost

always settle. But Class Counsel have litigated many TCPA class actions and know that settlement is not a foregone conclusion. They have lost TCPA cases at class certification and on summary judgment. ECF No. 103 ¶ 23; ECF No. 105 ¶ 26; ECF No. 106 ¶ 15.

Ms. Hightower offers a superficial analysis of the factors outlined in *Jones*, 887 F.3d at 450, that ignores the evidence in the record. For example, the first factor examines "the control exerted by the employer." *Id.* Ms. Hightower concludes that "Pivotal did assert some control over EPLJ." ECF No. 112 at 10. But that same finding was insufficient in *Jones*, where the court explained that "Royal did not have the right to control the hours the telemarketers worked nor did it set quotas for the number of calls or sales the telemarketers had to make." 887 F.3d at 451. The same is true in this case. Ms. Hightower also argues that telemarketers "entire existence depends on companies requesting their services" in an effort to show that Pivotal and EPLJ are not engaged in distinct occupations. ECF No. 112 at 11. But as the Ninth Circuit explained in *Jones*, the real inquiry is whether the telemarketer is "an independent business, separate and apart from" the company that hires it. 887 F.3d at 452. EPLJ and Pivotal are separate businesses in distinct occupations. Ms. Hightower, of course, could have opted out and pursued an individual claim against Pivotal if she was convinced that she could prove Pivotal's vicarious liability and obtain greater damages.

Ms. Hightower says that the financial data Pivotal supplied is unpersuasive and out of date. However, the relevant timeframe for determining Pivotal's financial situation is when the deal was consummated, not some later time period. Nor would it make any sense for Pivotal to produce its current financials given that the information would not be available to the class and they would have no opportunity to comment upon it. As it stands, Mr. Fayer signed his declaration on January 26, 2018 and it includes information about the company's finances for the last several years, including how the company was doing financially at the time the settlement was reached. That is all that is relevant. Regardless, it is highly unlikely that the company's financial condition has drastically improved in the intervening period. Ms. Hightower's

conclusory arguments offer no basis to question the financial information that Pivotal provided in a sworn declaration. *See Torisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (rejecting challenges to evidence of the defendant's financial condition because the objector "offers nothing but conclusory argument to the contrary").

Ms. Hightower also reiterates her argument that Mr. Fayer's declaration should be unsealed. The parties briefed this issue at length, *see* ECF Nos. 121 & 122, and the Court ruled that it was appropriate to seal the confidential financial information in the declaration. ECF No. 123. Ms. Hightower makes no new points in her supplemental objection.

2.    <u>As the Court previously recognized, it was appropriate to use a claims process.</u>

Ms. Hightower argues that payments should have been mailed directly to class members. This is also an issue the Court raised at the initial preliminary approval hearing. ECF No. 81 at 4:14-23. In their renewed motion for preliminary approval, Plaintiff pointed out that submitting a claim required minimal effort, since the class member had only to enter a name, physical address, email address, contact telephone number, the telephone number that received the call, and provide a signature. ECF No. 92-1 Ex. 1. The parties also ensured that mechanisms were in place to encourage the filing of claims. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 591 (N.D. Ill. July 29, 2011) (observing that the proposed claim form was "not unduly burdensome, long, or complex" and the parties' "use of a settlement website and toll free number suggests that the claims process was designed to encourage—not discourage—the filing of claims").

When no notice has previously been sent to the class (as it would be if, for example, the class was previously certified) and class members' contact information has not been verified as current, courts recognize that a claims process is appropriate. *See, e.g., In re Uber FCRA Litig.*, No. 14-cv-05200-EMC, 2017 WL 2806698, at *8 (N.D. Cal. June 29, 2017); *Braynen v. Nationstar Mortg., LLC*, No. 14-CV-20726, 2015 WL 6872519, at *14 (S.D. Fla. Nov. 9, 2015). Using a claims process ensures that settlement funds are not sent out to unverified addresses, which would be both inefficient and unnecessarily expensive. *See In re Uber*, 2017 WL

2806698, at *8 ("In short, the overall recovery of the class would likely be lessened for a highly uncertain benefit, given the likelihood that much of the available contact information is outdated."). Indeed, the Settlement Administrator estimated that sending checks directly to class members would add more than a million dollars to the anticipated cost of the notice program. ECF No. 93 (Azari Decl.) ¶ 21 (the cost of administration would increase from $1,231,675 to $2,241,000). Numerous courts have recognized that "there is nothing inherently objectionable" about a claims-submission process, especially when it ensures that only verified class members receive a check. *Shames v. Hertz Corp.*, No. 07-cv-2174-MMA(WMC), 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012) (overruling objection that the defendants knew who everyone in the class is and thus could simply send everyone cash, noting that courts "routinely approve claims-made settlements," and citing cases); *see also In re Online DVD*, 779 F.3d at 944–945 (approving settlement where cash component of settlement was divided among claimants).

Ms. Hightower cites *Rodriguez v. Kraft Foods Group, Inc.*, but the settlement in that case did not involve a claim process. No. 1:14-cv-1137-LJO-EPG, 2016 WL 5844378, at *3, 8 (E.D. Cal. Oct. 4, 2016). In the other cases she cites courts granted final approval despite low claim rates. *See Eastwood v. S. Farm Bureau Cas. Ins. Co.*, No. 3:11-CV-3075, 2014 WL 4987421, at *3-5 (W.D. Ark. Oct. 7, 2014) (approving settlement despite disappointment with the low claims rate, and noting that "some responsibility for class participation should be laid at the feet of the class members themselves"); *Larsen v. Trader Joe's Co.*, No. 11-cv-06188, 2014 WL 3404531, at *1-2 (N.D. Cal. July 11, 2014) (approving settlement of claims of all persons who purchased products labeled as "all natural" even though only 59,830 class members filed claims).

3.    The requested attorneys' fees, which include unreimbursed costs, are reasonable.

Finally, Ms. Hightower objects to the amount of requested attorneys' fee, another issue the Court raised at the initial preliminary approval hearing. ECF No. 81 at 5:16-20. Plaintiff addressed the appropriateness of the percentage-of-the-fund method and the 25% benchmark for the fee award in this case, as well as the factors courts consider in deciding whether the

benchmark should be adjusted, in its motion for attorneys' fees. *See* ECF No. 102. Plaintiff inadvertently omitted Mr. McCue's detailed time records and has since filed them. *See* ECF No. 126; *see also* Murray Decl. ¶ 19. While it did not include the time records, the declaration Mr. McCue filed in support of the motion summarized the hours he dedicated to this litigation and described the work he performed. *See* ECF No. 106 (McCue Declaration).

Ms. Hightower argues that the fee should be adjusted downward or be limited to Class Counsel's lodestar. But the fact that Pivotal could not afford a greater settlement does not warrant reducing the fee award. Pivotal's financial situation made the litigation even more risky for Class Counsel, who faced the prospect of no recovery for their work. Class Counsel had to vigorously pursue class members' claims while remaining mindful of their time and expenses—in fact, Ms. Hightower recognizes that Class Counsel were able to translate their substantial experience with these types of cases into a restrained approach that kept their total hours relatively low. Class Counsel ultimately achieved a recovery that will pay approximately $143.91 to each class member who filed a claim, justifying a fee award at the Ninth Circuit's benchmark of 25% of the common fund.

Plaintiff cited cases in which courts have awarded fees at or above the Ninth Circuit's 25% benchmark in TCPA settlements. ECF No. 102 at 15-16. That Ms. Hightower is able to cite cases in which courts awarded a reduced fee does not demonstrate that an adjustment is warranted in this case. Moreover, in the cases she cites the courts identified "special circumstances" that supported a reduction. *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (noting that a lodestar recovery may be used "when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors" but approving a fee of 25% of the common fund); *see also Bayat*, 2015 WL 1744342, at *9 (awarding a fee of class counsel's lodestar plus a 50% multiplier where counsel spent only 621 hours litigating the case); *Rose v. Bank of Am. Corp.*, No. 5:11-cv-02390-EJD, 2014 WL 4273358, at *9 (N.D. Cal. Aug. 29, 2014)

(settlement resolved six separate cases litigated by a total of 18 attorneys); *Michel* v. *WM Healthcare Solutions, Inc.*, No. 1:10-cv-638, 2014 WL 497031, at *17 (S.D. Ohio Feb. 7, 2014) (awarding a percentage of the fund but adjusting it downward after considering the factors the Sixth Circuit uses to evaluate fee awards and noting that the quality of counsel's work was "ordinary at best" given the many errors in the settlement process); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-1290-BEN-NLS, 2013 WL 12095060, at *1 (S.D. Cal. June 21, 2013) (class counsel sought only 22.5% of the common fund, and the court awarded that amount); *Arthur* v. *Sallie Mae, Inc.*, No. 10-cv-00198-JLR, 2012 WL 4076119, at *2 (W.D. Wash. Sept. 17, 2012) (district court did not explain why it awarded a fee of 20% of the common fund instead of the 25% benchmark after praising counsel and the settlement).

Ms. Hightower's advocacy of the lodestar method ignores the many advantages of the percentage-of-the-fund method recognized by courts and commentators. *See, e.g., In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) (the percentage method "is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure'" (citation omitted)); Alan Hirsch, et al., *Awarding Attorneys' Fees and Managing Fee Litigation*, 82-83 (Federal Judicial Center 3d ed. 2015) (the percentage method "helps ensure that the fee award will simulate marketplace rates, since most common fund cases are handled on a contingency basis" and "unlike the lodestar method, the percentage method provides incentives to plaintiff's counsel to settle the case early and avoid racking up litigation fees"); William B. Rubenstein, *Why the Percentage Method?*, 2 Class Action Attorney Fee Digest 93 (March 2008) ("[U]nder the percentage method, counsel has an interest in generating as large a recovery for the class as possible, as her fee increases with the class's take, while keeping her hours to the minimum necessary to do the job effectively."). She also ignores the negative incentives created by the lodestar method. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002) ("[I]t is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on

litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement"); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (the lodestar method "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits" (alterations in original) (citation omitted)).

In a case like this one, where Class Counsel were faced with a financially challenged defendant and difficulties in proving the merits, the percentage-of-the-fund method will appropriately reward Counsel's efficiency and skill, as well as the risk they undertook. Class Counsel also do not seek separate reimbursement of their expenses, which total more than $50,000. And since filing their fee motion, Class Counsel have devoted hundreds of additional hours to this litigation, including responding to class member inquiries, preparing this motion, and addressing Ms. Hightower's objections to the sealing of Pivotal's financial information and to the settlement. Class Counsel will attend the final approval hearing and will continue to work with the Settlement Administrator on implementing the settlement and to respond to class member inquiries. By the time the case has concluded, Class Counsel's lodestar will exceed the $663,640.50 they had incurred as of late May and the multiplier will be much lower. None of the cases Ms. Hightower cites supports use of the lodestar method or a reduced multiplier, particularly since courts "routinely enhance[] the lodestar to reflect the risk of non-payment in common fund cases." *Vizcaino*, 290 F.3d at 1051; *see also id.* at 1051 n.6 (collecting cases in which courts awarded multipliers up to 4). In *Landsman & Funk, P.C. v. Skinder-Strauss Associates*, for example, the Third Circuit affirmed a fee award of one-third of the $625,000 common fund, which represented a 2x multiplier. 639 F. App'x. 880, 883 (3d Cir. 2016).

## V.  CONCLUSION

Plaintiff respectfully requests that the Court certify the settlement class, overrule the objections, and approve the settlement as fair, reasonable and adequate.

RESPECTFULLY SUBMITTED AND DATED this 31st day of August, 2018.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Jennifer Rust Murray, *Admitted Pro Hac Vice*
Beth E. Terrell, CSB #178181
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email: jmurray@terrellmarshall.com
Adrienne D. McEntee, *Admitted Pro Hac Vice*
Email: amcentee@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Steven M. Tindall, SBN #187862
Email: smt@classlawgroup.com
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

Edward A. Broderick
Email: ted@broderick-law.com
Anthony I. Paronich, *Admitted Pro Hac Vice*
Email: anthony@broderick-law.com
BRODERICK & PARONICH, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Matthew P. McCue, *Admitted Pro Hac Vice*
Email: mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

*Class Counsel*

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AND RESPONSE TO OBJECTIONS;
MEMORANDUM OF POINTS AND AUTHORITIES - 26
CASE NO. 3:16-CV-05486-JCS

## CERTIFICATE OF SERVICE

I, Jennifer Rust Murray, hereby certify that on August 31, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Antony Buchignani, SBN #186528
Email: tbuchignani@tocounsel.com
Drew Hansen, SBN #218382
Email: dhansen@tocounsel.com
Amy Burke, SBN #276699
Email: aburke@tocounsel.com
Seth M. Goldstein, SBN #232071
Email: sgoldstein@tocounsel.com
THEODORA ORINGHER PC
1840 Century Park East, Suite 500
Los Angeles, California 90067-2120
Telephone: (310) 557-2009
Facsimile: (310) 551-0283

*Attorneys for Defendant*

Timothy Ricardo Hanigan
Email: trhanigan@gmail.com
LANG HANIGAN & CARVALHO, LLP
21550 Oxnard Street, Suite 760
Woodland Hills, California 91367
Telephone: (818) 883-5644
Facsimile: (818) 704-9372

*Attorneys for Objector Route 42 Dance Academy, LLC*

DATED this 31st day of August, 2018.

TERRELL MARSHALL LAW GROUP PLLC


By: /s/ Jennifer Rust Murray, *Admitted Pro Hac Vice*
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email: jmurray@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone (206) 816-6603
Facsimile: (206) 319-5450

*Class Counsel*