Drew R. Hansen, Esq. (State Bar No. 218382)
dhansen@tocounsel.com
Seth M. Goldstein, Esq. (State Bar No. 232071)
sgoldstein@tocounsel.com
THEODORA ORINGHER PC
535 Anton Blvd, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Attorneys for Defendant PIVOTAL PAYMENTS
INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ABANTE ROOTER AND PLUMBING, INC., individually and on behalf of all others similarly situated,

        Plaintiff,

  vs.

PIVOTAL PAYMENTS, INC., d/b/a CAPITAL PROCESSING NETWORK and CPN,

        Defendant.

Case No. 16-CV-05486-JCS
Honorable Joseph C. Spero

**DEFENDANT PIVOTAL PAYMENTS, INC.'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT**

HEARING DATE:  October 5, 2018
TIME:         2:00 p.m.
LOCATION:    Courtroom G – 15th Floor

# TABLE OF CONTENTS

**Page**

I.  The Class's Response To The Proposed Settlement ...............................................................3

    A.  The Ebneter Objection ...............................................................4

    B.  The Dance Academy Objection ...............................................................4

II. The Court Reiterates That The Fayer Declaration Was Properly Sealed, But Permits Dance Academy To Review The Declaration And Submit A Supplemental Objection ........4

I.  The Settlement Amount Is Fair, Reasonable And Adequate ...............................................................5

    A.  Plaintiff Would Almost Certainly Lose If It Continued To Litigate ...........................6

        1.  The Amended Jones Opinion Increases The Likelihood Plaintiff Would Lose ...............................................................6

        2.  EPLJ Was Not Pivotal's Agent Under The Restatement Test ...........................7

        3.  Plaintiff's Case Depends Entirely Upon A Biased And Unreliable Witness ...............................................................11

    B.  Pivotal Has Provided Sufficient Information About Its Financial Status To Support The Settlement Amount ...............................................................13

II. The Response Of The Class Weighs Heavily In Favor Of Final Approval .........................14

III. Dance Academy's Objection Is Not Made In Good Faith ...................................................15

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*Chambers v. Whirlpool Corp.*
    No. 11-1733-FMO, 2016 WL 5922456 (C.D. Cal. Oct. 11, 2016) ............................... 16, 17

*Dennis v. Kellogg Co.*
    No. 09-CV-1786-IEG (WMC), 2013 WL 6055326 (S.D. Cal. Sep. 10, 2013) ................... 16

*Garber v. Office of Comm'r of Baseball*
    No. 12-CV-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017) ...................... 17, 18

*Gascho v. Global Fitness Holdings, LLC*
    822 F. 3d 269 (6th Cir. 2016) .................................................................. 14, 15

*Henderson v. United Student Aid Funds, Inc.*
    No. 13-cv-1845-JLSBLM, 2017 WL 766548 (S.D. Cal. Feb. 28, 2017) .......................... 8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*
    281 F.R.D. 531 (N.D. Cal. 2012) ................................................................. 17

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*
    370 F.Supp.2d 320 (D. Me. 2005) ............................................................... 15

*In re Hydroxycut Mktg. & Sales Practices Litig.*
    No. 09-cv-1088-BTM-KSC, 2013 WL,5275618 (S.D. Cal. Sept. 17, 2013) ..................... 17

*In re Skilled Healthcare Grp., Inc. Sec. Litig.*
    No. CV 09-5416 DOC RZx, 2011 WL 280991 (C.D. Cal. January 26, 2011) .................. 14

*In re Wal-Mart Wage & Hour Emp't Practices Litig.*
    No. 06-cv-00225, 2010 U.S. Dist. LEXIS 21466 (D. Nev. Mar. 8, 2010) ........................ 17

Jones v. Royal Adm. Svcs., Inc.
    866 F.3d 1100 (9th Cir. 2017*) amended by* 887 F.3d 443 (9th Cir. 2018) ................. passim

*Kern v. VIP Travel Servs.*
    2017 WL 1905868 (W.D. Mich. May 10, 2017) ................................................... 7

*Kristensen v. Credit Payment Servs. Inc.*
    879 F.3d 1010 (9th Cir. 2018) ..................................................................... 6

*Negrete v. Allianz Life Insurance Company of North America Eyeglasses*
    2015 WL 12592726 (C.D. Cal. March 17, 2015) ................................................. 2

*Perez v. Asurion Corp.*
    501 F. Supp. 2d 1360 (S.D. Fla. 2007) ........................................................... 15

*Poertner v. Gillette Co.*
    618 F. App'x 624  (11th Cir. 2015) .............................................................. 14

ii

Case No. 16-CV-05486-JCS

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

*Roberts v. Electrolux Home Prods*.
    No. 12-cv-01644, 2014 WL 4568632 (C.D. Cal. Sept. 11, 2014) ...................................... 16

*Simon v. Toshiba Am*.
    No. C 07-06202 MHP, 2010 WL 1757956 (N.D. Cal. Apr. 30, 2010) .............................. 14

*Strauss v. CBE Grp., Inc*.
    173 F. Supp. 3d 1302 (S.D. Fla. 2016)................................................................................. 8

*Thomas v. Taco Bell Corp*.
    879 F. Supp. 2d 1079 (C.D. Cal. 2012) aff'd 582 Fed. App'x 678 (9th Cir. 2014 .............. 8

*Touhey v. United States*
    No. EDCV 08-01418-VAP (RCx), 2011 WL 3179036 (C.D. Cal. July 25, 2011)............. 14

## **OTHER AUTHORITIES**

Adam Zimmerman, *Funding Irrationality*
    59 Duke L.J. 1105, 1167 (2010)........................................................................................ 15

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

THEODORA ORINGHER
COUNSELORS AT LAW

## INTRODUCTION

The Settlement Class's response to the Settlement is overwhelmingly positive and confirms that it should be finally approved. In fact, out of approximately 1.9 million class members in this case, only two have even arguably expressed any concern about the Settlement. But the first potential objector has not provided any support for his objection. As for the second objector, it is driven by self-interested attorneys who routinely attempt to profit from objecting to class action settlements as part of their business model and who have not raised any valid concerns with the Settlement. Accordingly, the Court should grant final approval of the parties' proposed Settlement for multiple reasons, including because:

- It has received an extremely favorable response from the class of 1,902,283 members, of which only 47 (or 0.002%) have submitted requests to be excluded from the Settlement and only 2 (or 0.0001%) have filed timely objections.

- It is a fair, arms-length compromise of a dispute that would otherwise be protracted, uncertain and expensive;

- It was recommended by a well-respected, neutral mediator who independently evaluated the strengths and weaknesses of each side's position;

- The Court already evaluated at the preliminary approval stage almost all of the supposed concerns raised by the attorney-driven objection and concluded the Settlement was fair, reasonable, and adequate;

- The Settlement provides significant monetary recovery to the Settlement Class in the form of a $9 million non-reversionary settlement fund;

- The Settlement Class would recover nothing if Pivotal prevails on the vicarious liability issue, which it has a very good chance of doing in light of the applicable law in the Ninth Circuit; and

- The Settlement is justified in light of Pivotal's financial condition.

The Settlement is not only fair, reasonable, and adequate, but will permit tens of thousands of individuals to obtain a prompt and fair payout of their claims in the most efficient manner possible. In fact, final approval would avoid both the near certainty that Pivotal will prevail on the issue of vicarious liability at summary judgment or trial, leaving class members with nothing as noted above, and the virtual certainty that, even if Plaintiff, against all odds, were able to establish Pivotal's liability

for the allegedly TCPA-violating calls at issue, either the Court would refuse to enter an award for the full amount of statutory damages prescribed by the statute for fear of offending due process or Pivotal would be unable to satisfy even a small percentage of such an award.

None of the arguments raised in either of the two objections warrant withholding final approval from the Settlement. Objector Bruce Ebneter claims that the Settlement's anticipated pay-out of $20-$60 per unsolicited phone call does not adequately compensate him for all possible damages he may have suffered, but this is in reality nothing more than a complaint that settlements in general reflect a compromise between what the plaintiff believes they are owed and what the defendant believes it owes the plaintiff, based upon each of the parties' assessment of the risks they face in bringing the dispute to judgment. However, Ebneter's objection includes no discussion of the risks Plaintiff and Pivotal faced sufficient to call into question the adequacy of the proposed settlement. Indeed, Ebneter's "objection" contains no real analysis or argument at all.

In similar circumstances, courts have held that objections expressing a desire for a better deal or which ask the Court to provide additional relief than that offered by the settlement are not valid grounds for objecting to a proposed class settlement. The fact that "'[o]bjectors may have made another bargain is beside the point; settling parties need not find the most ideal terms.' The issue here is whether the benefits offered by the settlement presented to the Court are fair, reasonable and adequate for the class as a whole, and . . . they are." *Negrete v. Allianz Life Insurance Company of North America Eyeglasses*, 2015 WL 12592726, at *8 (C.D. Cal. March 17, 2015). Accordingly, Mr. Ebneter's objection lacks merit and should be promptly overruled.

As for the second objector (i.e.,, Route 42 Dance Academy, LLC ("Dance Academy"), it argues that the parties have overstated the risks Plaintiff faces in continuing to litigate the action and that the "true" level of risk does not justify the proposed settlement amount. However, the cursory analysis proffered by what is in actuality an attorney-driven objection grossly misrepresents both the applicable law and the evidentiary record. The simple truth is that the Court already considered most of Dance Academy's arguments at the preliminary approval stage and ultimately concluded that the Settlement was fair, reasonable and adequate after analyzing the various issues. Moreover, there is almost no chance that Plaintiff will be able to prove its claims against Pivotal. And even if it

somehow did astonishingly establish Pivotal's vicarious liability with a "star witness" like Gordon Rose who has significant credibility and reliability issues, Defendant could not possibly pay anything close to the statutory exposure in this case. Dance Academy's other arguments are likewise without merit. For example, although Dance Academy asserts that the Settlement's use of a claims process and the resulting claims rate weigh against final approval of the Settlement, both are well in line with settlements in similar consumer class actions and Dance Academy has not cited any authority to the contrary.

For all of the reasons set forth below and in the parties' preliminary approval papers, the objections should be overruled and the Settlement approved.

## BACKGROUND[1]

### I. The Class's Response To The Proposed Settlement

On March 28, 2018, the Court issued an order preliminarily approving the parties' proposed class action settlement. [ECF No. 100.] On April 27, 2018, in compliance with that order, the settlement administrator mailed the Class Notice approved by the Court to the 1,746,849 class members (out of 1,902,283 total class members) for whom the administrator had been able to locate address information. The Class Notice informed the class members that, *inter alia*, they could (1) submit a claim form for a cash award by June 29, 2018, (2) opt out of the lawsuit and keep any right they may have to sue Pivotal by informing the settlement administrator by June 29, 2018, (3) object to the Settlement (provided they did not opt out) by sending their objection(s) to the Court by June 29, 2018, or (4) do nothing, receive no payment, and lose the right to sue Pivotal on the released claims.

In response to the Class Notice, 37,970 class members (i.e., 2.00% of the class) submitted valid claim forms,[2] 47 class members (i.e., 0.002% of the class) submitted valid requests to opt out of

---

[1] Pivotal's Memorandum In Support of Plaintiff's Renewed Motion for Preliminary Approval of Class Action Settlement includes a detailed account of both the facts underlying Plaintiff's complaint and also the history of the litigation through the date Plaintiff filed its Renewed Motion for Preliminary Approval.. [See ECF No. 95 at pp. 2-9.] In the interest of economy, Pivotal does not repeat this account here, but rather picks up where it ended. It nevertheless incorporates those facts by reference herein.

[2] The 37,970 total includes 76 claims that were submitted after the claims deadline, but which were otherwise valid and the parties have agreed should be treated as valid.

the lawsuit and two class members (i.e., 0.0001% of the class) submitted timely objections to the settlement.

### A.     The Ebneter Objection

Class member Bruce Ebneter objects to the settlement on the grounds that the anticipated payout of $20-$60 per unsolicited phone call would not "adeq[ua]t[e]ly reflect any/all possible dollar amounts lost" where the unsolicited calls might have caused him to miss calls from his clients, denying him an opportunity for possible income.  [ECF No. 111.]

### B.     The Dance Academy Objection

Class member Dance Academy objects to the Settlement based on its contention that class counsel has failed to provide sufficient justification for releasing class members' claims in exchange for what Dance Academy considers a "token" amount.[3]  [ECF No. 112]   According to Dance Academy, Class Counsel has overstated the risk that Pivotal will prevail on summary judgment or at trial and, to the extent Class Counsel is relying on Pivotal's ability to pay to justify the Settlement amount, has failed to provide class members with sufficient information to assess that ability in that the submission regarding Pivotal's finances – i.e., the Declaration of Philip Fayer ("Fayer Declaration") – has been submitted under seal.  Dance Academy also objects to the use of a claims process, arguing that payments should have been mailed directly to class members and that the "low" claims rate demonstrates that the Settlement is unfair.

## II.    The Court Reiterates That The Fayer Declaration Was Properly Sealed, But Permits Dance Academy To Review The Declaration And Submit A Supplemental Objection

On July 10, 2018, the Court set a telephone conference for July 13, 2018 to address Dance Academy's contention that the Fayer Declaration should be unsealed.  [ECF No. 113.]  At the conclusion of the conference, the Court directed Plaintiff and Pivotal to submit briefs regarding the

---

[3] Dance Academy also objects to Class Counsel's request for fees, contending that the amount is excessive given what Dance Academy believes is a "poor result."  Pivotal takes no position with respect to the appropriateness of Class Counsel's request, but notes that, even if the Court were to determine that the requested fee is unwarranted in any way, such a determination should have no impact on the conclusion that the settlement is fair, reasonable and adequate.  The Settlement would still have to be approved.  Any difference between the amount of fees requested and the amount of fees awarded would simply go to the class members per the terms of the Settlement Agreement.  [*See* ECF No. 92-1 at ¶¶ 3.1, 4.2, 10 & 11.]

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

issue by no later than July 20, 2018. [ECF No. 119.] After considering the parties' briefs [ECF Nos. 121 & 122], the Court concluded that the Fayer Declaration was properly sealed and should remain confidential, finding that (1) there were compelling reasons for the sealing of the sensitive financial information set forth in the Declaration and those reasons still exist, and (2) the sealing of the Declaration had not impaired the ability of the class members to evaluate the settlement where the Declaration was the only document in the case that had been filed under seal, no class members had contacted Class Counsel to obtain access to the Declaration and no class members other than Dance Academy had asked the court to unseal the Declaration. [ECF No. 123.] Notwithstanding its conclusion that the Fayer Declaration was properly sealed, the Court, at the parties' suggestion, permitted Dance Academy to review the Declaration once it and its counsel agreed to be bound the protective order governing the case. [*Id.*]

On August 3, 2018, after obtaining and reviewing the Declaration, Dance Academy filed a Supplemental Objection that does nothing to change the fact that the Settlement should be finally approved. Specifically, as part of its attorney-driven Supplemental Objection, Dance Academy "renewed" its request that the Court unseal the Declaration and asked the Court to order Pivotal to submit current and/or more detailed financial information, which makes no sense for the reasons explained below. [ECF No. 125.]

**ARGUMENT**

As demonstrated in the parties' preliminary approval papers, the Court's ruling at the preliminary approval stage, and below, the proposed settlement is fair, reasonable and adequate given the hurdles that Plaintiff would face if it were to continue to litigate the action. The Court should therefore overrule the two objections and grant final approval of the proposed Settlement.

**I.    The Settlement Amount Is Fair, Reasonable And Adequate**

Notwithstanding the total amount of statutory damages class members could theoretically recover on their TCPA claims if they were to win at trial, the amount of the proposed settlement is unquestionably fair and reasonable given the significant cumulative risk that Plaintiff would lose at the summary judgment stage or at trial or, in the event it prevailed, would be unable to obtain or collect on a judgment of more than $9 million. The objectors' complaints that the settlement amount

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

1   does not reflect all of their potential damages or is otherwise inadequate does not take into account

2   these risks.  Nor are these issues that the Court is addressing for the first time.  On the contrary, the

3   Court considered these exact questions at the preliminary approval stage and was convinced that the

4   significant risks associated with Plaintiff's case and the financial condition of Pivotal (evidence of

5   which is undisputed) supported the conclusion that the Settlement is fair, reasonable, and adequate.

6   Because nothing has changed since that the Court preliminarily approved the Settlement, it follows

7   that final approval should be granted as well.

### A.    Plaintiff Would Almost Certainly Lose If It Continued To Litigate

9        It is undisputed that the allegedly unlawful calls at issue in this action were made by EPLJ

10  Enterprises, Inc. and/or its principal Gordon Rose (together, "EPLJ"), and not by Pivotal.  Plaintiff

11  must therefore establish that EPLJ was Pivotal's agent when EPLJ made the calls if it hopes to prevail

12  on its TCPA claims against Pivotal.  However, based on the record evidence and the Ninth Circuit's

13  decisions in *Jones v. Royal Adm. Svcs., Inc.*[4] and *Kristensen v. Credit Payment Servs. Inc.*,[5] it is a near

14  certainty that Plaintiff would be unable to establish such an agency relationship.  While Objector

15  Dance Academy contends that the parties have overstated Plaintiff's risk of loss, its argument is based

16  on misrepresentations of both the applicable law and the relevant facts.

### 1.    The Amended Jones Opinion Increases The Likelihood Plaintiff Would Lose

18       Noting that the Ninth Circuit amended its opinion in *Jones* shortly after the Court granted

19  preliminary approval, Dance Academy claims that this amended opinion somehow "narrows" the

20  original *Jones* holding.  [Dkt. No. 112 at 8.]  However, it does not – and could not – explain how this

21  supposed narrowing undermines the conclusion that Plaintiff would be extremely unlikely to prevail

22  under the facts present here.  Moreover, the amended *Jones* opinion does not in fact narrow the Ninth

23  Circuit's original holding; indeed, it actually expands that holding.  Whereas the original opinion's

24  affirmance of the district court's grant of summary judgment to the defendant was based solely on the

25  grounds that the defendant was not in an agency relationship with the entity that had made the

26  allegedly TCPA-violating calls under the applicable Restatement test (*see generally Jones,* 866 F.3d

27       [4] 866 F.3d 1100 (9th Cir. 2017), *amended by* 887 F.3d 443 (9th Cir. 2018).

28       [5] 879 F.3d 1010 (9th Cir. 2018).

1100), the amended opinion affirmed on an additional, alternative reason, namely, that, even if the entity had been defendant's agent, the entity did not have actual authority to make calls in violation of the TCPA on defendant's behalf where their contract prohibited the entity from violating laws relating to telemarketing. *Jones,* 887 F.3d at 449; *see also Kern v. VIP Travel Servs.*, 2017 WL 1905868, at \*6 (W.D. Mich. May 10, 2017) (holding that even if defendant had been in an agency relationship with the entity that had placed the allegedly unlawful calls, the fact that its contract with the entity required the entity to comply with all telemarketing laws demonstrated that the defendant had not conferred authority on the agent to make calls in violation of the TCPA and that the agent could not reasonably believe it had such authority). The situation is no different here. Indeed, given that the Letter of Agreement between Pivotal and EPLJ expressly states that "**EPLJ is responsible for compliance with all FCC and TCPA Guidelines and State regulations until point of delivery**," the Ninth Circuit's amendment of its *Jones* opinion does not, as Dance Academy claims, reduce Plaintiff's litigation risk; rather, it increases that risk and makes the case even more controlling as to the what the outcome would be here.

### 2. EPLJ Was Not Pivotal's Agent Under The Restatement Test

That *Jones* supports the conclusion that Pivotal is not likely to be found liable is further revealed by a closer examination of the ten factors the Ninth Circuit has adopted "for determining whether a principal has enough authority to control the actions of its agent such that the principal may be held vicariously liable" for the agent's conduct, namely:

> 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities [and the place of work], 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business.

887 F.3d at 450. Dance Academy erroneously claims that there is enough evidence in the record to support a conclusion that EPLJ was Pivotal's agent under this ten-factor test [ECF No. 112 at 10-11], but its claim is based on gross misrepresentations of both the factors and the evidence.

The control exerted by the employer. Dance Academy asserts that "Pivotal did assert *some*

control over EPLJ," citing Mr. Rose's testimony that Pivotal told him the types of businesses it was interested in (or not interested in) acquiring as customers. [Dkt. No. 112 at 10 (emphasis added).] However, even if Pivotal's specification of the types of leads it wanted to purchase from EPLJ could be construed as a form of control over EPLJ's work (and it cannot), such a minor "control" is insufficient to support an agency relationship where the record evidence demonstrates Pivotal exerted no control over (1) how EPLJ obtained the "raw data" from which EPLJ created the lists of businesses that EPLJ called, (2) the "proprietary" cell phone scrubbing protocols EPLJ claims to have applied to this data, (3) the dialer into which EPLJ loaded the resulting lists of telephone numbers, (4) the parameters of the calling campaigns (i.e., dates, times, volume) that EPLJ programmed into the dialer, or (5) the scripts of the prerecorded messages that EPLJ played to those businesses that answered EPLJ's calls. Indeed, in *Jones*, the Ninth Circuit acknowledged that the defendant had "exercised *some* amount control" over the third-party telemarketer because it – unlike Pivotal here – had provided materials, training, and call scripts to the telemarketer, but still concluded that the telemarketer had not been defendant's agent because defendant had not specifically controlled the calls at issue. *Id*. at 451 (emphasis added). Simply put, "some" control is not enough to establish an agency relationship, and courts routinely grant summary judgment on this issue in favor of defendants that exerted far more control over the telemarketers alleged to have been their agents than Pivotal allegedly exerted over EPLJ here.[6]

---

[6] *See, e.g., Henderson v. United Student Aid Funds, Inc.*, No. 13-cv-1845-JLSBLM, 2017 WL 766548 at *6 (S.D. Cal. Feb. 28, 2017) (concluding that, although defendant's contract with the loan servicer it had hired to collect on defaulted loans required the servicer to provide detailed quarterly performance reports and permitted defendant to submit recommendations to improve the servicer's performance, these requirements did not constitute sufficient control over the manner and means by which the servicer collected on the loans to demonstrate the defendant's liability for the calls the servicer had placed); *Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1310 (S.D. Fla. 2016) (holding that, although defendant had access to its alleged agent's system to conduct quality control measures, such as performing random audits of calls, conducting onsite audits every 6 to 9 months and reviewing reports the alleged agent made available, these measures fell short of establishing the type of control over the calling campaign necessary to support an agency relationship); *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084, 86 (C.D. Cal. 2012) (holding that, although the defendant knew of an advertising association's text message advertising campaign, approved the campaign via its vote on the association's board and funded the campaign, the defendant was not in an agency relationship with the association, reasoning that that "knowledge, approval, and fund administration do not amount to controlling the manner and means of the text message campaign"), *aff'd* 582 Fed. App'x 678 (9th Cir.

THEODORA ORINGHER
COUNSELORS AT LAW

Whether the one employed is engaged in a distinct occupation.  Dance Academy admits that EPLJ was engaged in a distinct occupation – telemarketing.  [ECF No. 112 at 10 ("telemarketing is a distinct occupation").]  It goes on to assert that telemarketing's entire existence depends on companies requesting telemarketing services and that telemarketing is not a "stand-alone" business, as if this somehow distinguishes telemarketing from other occupations or renders the fact that it is a distinct occupation meaningless.  It does not.  The simple truth is that EPLJ was an independent business, separate and apart from Pivotal, which "strongly suggests [EPLJ was] not subject to sufficient control to establish vicarious liability."  *Jones*, 887 F.3d at 452.

Whether the work was normally done under the supervision of the alleged employer.  Once again, Dance Academy points to Pivotal's alleged specification of the types of leads it wanted to purchase from EPLJ as evidence of control or supervision.[7]  However, as *Jones* makes clear, this factor is not about whether the alleged employer set parameters for the final product of the alleged agent's work, but whether that work itself was directly supervised by the alleged employer.  *Id.* at 452.  Here, Pivotal provided no training or supervision whatsoever to EPLJ or its employees.

The skill required.  Dance Academy admits that telemarketing "obviously requires some skill and, over the years, Rose has built up his experience in the industry."  [ECF No. 112 at 14.]  That Rose, as Dance Academy notes, started his career in telemarketing/lead generation at age 17 after dropping out of high school is irrelevant.  The critical point is that telemarketing and lead generation require skill, which weighs against a conclusion that EPLJ was Pivotal's agent.

Whether the employer supplies tools and instrumentalities [and the place of work].  Dance Academy claims that Pivotal supplied call centers in Dallas and Phoenix to EPLJ, but cites no evidence in support of this claim.  Its inability to provide such a citation is no surprise; the claim is totally false.  Pivotal did not supply call centers or any tools or instrumentalities of any kind to EPLJ and there is no evidence whatsoever anywhere in the record that even suggests that it did so.

The length of time employed.  The length of the engagement is yet another factor that supports

_____

2014).

[7] Pivotal categorically denies that it asked EPLJ to exclude businesses owned by members of specific ethnic groups from the leads EPLJ provided.

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

finding no agency relationship existed. Indeed, Dance Academy admits that the four-month length of Pivotal's relationship with EPLJ was "short" – a fact that weighs heavily against finding an agency relationship. Despite this admission, Dance Academy asserts that the two-year term of the Pivotal-EPLJ Letter of Agreement indicates a long-term relationship between them. [ECF No. 112 at 10-11.] As the Ninth Circuit has noted, however, where a contractual relationship has a contemplated end, such "designated impermanency" supports the conclusion that an alleged principal did not have enough control to be vicariously liable. *Jones*, 887 F.3d at 452.

Whether payment is by time or by the job. Dance Academy admits that EPLJ was paid by the job. Accordingly, this factor likewise supports a finding that no agency relationship existed.

Whether the work is in the regular business of the alleged employer. Dance Academy claims that "the telemarketing campaigns were part of Pivotal's business plan before it hired EPLJ." As an initial matter, this claim is false and unsupported by the evidence Dance Academy cites in support (i.e., testimony from the deposition of Gordon Rose that provides no information about Pivotal's business plan).

Furthermore, even assuming Pivotal had contemplated purchasing leads from a lead generator like EPLJ before Fifth Manhattan's president introduced it to EPLJ, such a fact would not support the conclusion Pivotal's regular business included lead-generation campaigns like the one EPLJ performed. Indeed, if such work had been part of Pivotal's regular business, there would have been no reason for it to contract with EPLJ in the first place.

The subjective intent of the parties. Citing Rose's testimony that Pivotal declined to have EPLJ audit Pivotal's internal procedures (or to pay the "compliance fee" EPLJ requested for such an audit), Dance Academy asserts that EPLJ/Rose did not intend to be liable for Pivotal's alleged violations of the TCPA. [Dkt. No. 112 at 11]. However, this factor is concerned with whether the parties intended to form an agency relationship, not whether one party intended to be liable for the other's torts. Moreover, EPLJ's intent with respect to its liability for Pivotal's actions is irrelevant because there is no dispute that the allegedly unlawful calls here were made exclusively by EPLJ, not Pivotal, and it is clear from both the Letter of Agreement and Rose's deposition testimony that EPLJ intended to be responsible for ensuring that its own actions complied with the TCPA. [Dkt. No. 96-1

at 36 (Rose Dep. at 131:10-24).]

<u>Whether the employer is or is not in business</u>.  Dance Academy and Pivotal agree that Pivotal is a business, but this is merely one factor in the analysis.

<u>Conclusion</u>.  After assessing all of the factors adopted by the Ninth Circuit, it is clear that EPLJ was an independent contractor and not Pivotal's agent.  Indeed, EPLJ was an independent business that hired its own employees, provided all of its own equipment and office space, set its own hours, and received payment only if it generated leads.  Although Pivotal told EPLJ what types of businesses Pivotal was interested in having EPLJ provide as leads (i.e., the end product of EPLJ's work), it exerted no control over the manner and means by which EPLJ generated such leads; it did not provide EPLJ with any employees or equipment, with any customer data or information, with any training, materials or telemarketing scripts, or with any direction about how EPLJ should go about generating leads.  Notwithstanding Dance Academy's attempt to muddy the water by distorting both the relevant factors and the record, there is very little, if any, chance that Plaintiff could establish that EPLJ was Pivotal's agent on these facts.  Furthermore, as discussed above and recognized by the amended *Jones* opinion, even if Plaintiff could establish that EPLJ was Pivotal's agent, it could not establish that EPLJ has actual authority to make calls in violation of the TCPA on Pivotal's behalf because  the Letter of Agreement makes clear that EPLJ could not make such calls.  Consequently, there is effectively no chance that Plaintiff could establish Pivotal's vicarious liability for EPLJ's calls or prevail on its claims against Pivotal.  Given this reality, the proposed settlement amount is fair and reasonable.

3.  <u>Plaintiff's Case Depends Entirely Upon A Biased And Unreliable Witness</u>

In the unlikely event that Pivotal did not prevail at summary judgment, Plaintiff wouldstill face significant challenges in proving its case at trial.  Whereas Pivotal would be able to present at trial even more extensive evidence demonstrating its lack of responsibility for EPLJ's actions, the critical evidence upon which Plaintiff's case would depend – the testimony and materials provided by "star" witness Mr. Rose – is simply not credible.  As an initial matter, Plaintiff may be unable to get Mr. Rose, a Georgia resident who was arrested in September 2017 for harassing and threatening an

Arizona state court judge,[8] to appear at trial. Moreover, whether Mr. Rose appeared at trial or not, Pivotal expects that his testimony and the other information he has produced in this action would do little to persuade the trier of fact that Pivotal is vicariously liable for EPLJ's actions.

First, as detailed in Pivotal's submission with respect to preliminary approval, Mr. Rose's deposition testimony confirms that Pivotal and EPLJ did not have a principal-agent relationship. [*See* ECF No. 95 at 2-9.]

Second, to the extent that Mr. Rose provided any testimony tending to suggest that EPLJ was Pivotal's agent, he is a biased and unreliable witness. Mr. Rose was very upset when Pivotal terminated its contract with EPLJ, as evidenced by a series of threatening emails he sent to Pivotal executives in the wake of the termination, and is motivated to harm Pivotal. Indeed, as he testified at his deposition, he hopes Pivotal goes out of business and "will do [his] very best" to see that it does go out of business. [*Id.* at 109:22-110:2 ("it's a pleasure that Pivotal is getting sued. I think it's wonderful. And therefore, I will do nothing furthermore in this case other than making sure that Pivotal is exposed for their horrible business practices."), 230:18-25 ("For the record, I think it's wonderful that Pivotal is getting sued by the way. … I think it's awesome."), 248:14-249:7 ("I hope they go out of business. … And I will do my very best to see that [the] compan[y] go[es] out of business.").] In addition to his stated pledge to put Pivotal out of business, Mr. Rose is simply an unstable individual – as demonstrated by the threats he made to an Arizona state court judge – and his recollection of EPLJ's interactions with Pivotal are particularly unreliable. In April 2016 – the month EPLJ and Pivotal entered into the LOA – Mr. Rose attempted to kill himself by deliberately overdosing on cocaine and spent time recuperating in a monastery. [*Id.* at 157:22-158:11, 247:6-18.] As a result, the months of his interaction with Pivotal are, as he testified, "a bit of a blur." [*Id.* at 158:6-7.] Mr. Rose's bias and unreliability is thus a significant hurdle that could prevent the class from recovering and Dance Academy's objection says nothing at all about that important issue.

---

[8] *See* https://www.mcso.org/Multimedia/PressRelease/Judgethreatarrest.pdf (last visited August 29, 2018).

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

**B.** **Pivotal Has Provided Sufficient Information About Its Financial Status To Support The Settlement Amount**

As discussed above, to the extent Class Counsel justified the settlement amount based upon Pivotal's inability to pay more, Dance Academy's initial objection requested that the evidence submitted under seal regarding that inability – i.e., the Fayer Declaration and its exhibit – be unsealed and claimed that class members could not assess the settlement without access to such evidence. Although the Court rejected this request and argument, Dance Academy's Supplemental Objection purports to "renew" its request that the Fayer Declaration be unsealed and also asks the Court to order Pivotal to submit current and/or more detailed financial information. [ECF No. 125] The Court should reject each of these requests.

As an initial matter, the Court has already determined on two separate occasions that the Fayer Declaration is properly sealed – first when it initially granted leave for the declaration to be filed under seal and again on July 24, 2018 when it rejected Dance Academy's initial request for unsealing. Nothing has changed and there is no reason for the Court to revisit this determination. Because the Court's prior rulings are sufficient to dispose of this objection, nothing further need be said in on that issue. Pivotal merely incorporates by reference the arguments made in its and Plaintiff's responses concerning the sealing issue (i.e., ECF Nos. 121 & 122), as well as the Court's March 15, 2018 and July 24, 2018 Orders (i.e., ECF Nos. 97 & 123).

As for Dance Academy's contention that the financial information presented by the Fayer Declaration is "out of date" because it is only through August 31, 2017 (i.e., the date the parties participated in a mediation with Bruce Friedman that resulted in the proposed settlement in mid-September) and must be updated with "current" information, the relevant question is whether the settlement is fair and reasonable based upon the information available to the parties when they entered into the Settlement, not whether it is fair and reasonable based upon information that was not available or events that had not occurred at that time. Indeed, if Pivotal's financial situation at the time of final approval were required to assess a settlement, it would be impossible for a class representative or absent class members to ever engage in an assessment of the financials because such information, by definition, is not available when the class representative agrees to a settlement or when preliminary

1  approval is granted and notice is provided to the class. Dance Academy's suggestion is thus absurd

2  and without merit.

3      Finally, Dance Academy's claim that some categories of the expenses listed in the Fayer

4  Declaration and attached exhibit thereto are not described in sufficient detail and "could include large

5  salaries to principals designed to make it look as if Pivotal is operating a loss" is nothing more than

6  rank speculation. It is well-settled that objections based on speculation or hypotheticals are

7  insufficient to reject a class action settlement. *See, e.g., In re Skilled Healthcare Grp., Inc. Sec. Litig.*,

8  No. CV 09-5416 DOC RZx, 2011 WL 280991, at *6 (C.D. Cal. January 26, 2011) (overruling

9  objections to a class action settlement "based on little more than hypothesis or speculation"). If the

10  rule were otherwise, an objector could always speculate about theoretical issues and courts could

11  never approve any settlement. Moreover, even if some portion of these categories of expenses

12  included such items (which is not the case), the dollar amounts at issue are not significant enough to

13  materially affect the conclusion that the settlement amount is fair and reasonable given Pivotal's

14  financial situation; i.e., Pivotal would still be a small company with a limited revenue stream and

15  limited cash reserves.

16  **II.    The Response Of The Class Weighs Heavily In Favor Of Final Approval**

17      Two percent of the class (37,970 ÷ 1,902,283 total class members = 2.00%) submitted valid

18  claims, while only two one-thousandths of one percent of the class (47 ÷ 1,902,283 = 0.002%) has

19  requested to be excluded and only one ten-thousandth of one percent of the class (2 ÷ 1,902,283 =

20  0.0001%) has objected to the settlement. The claims rate is, contrary to Dance Academy's assertion,

21  well within the typical range for consumer class actions. *See, Gascho v. Global Fitness Holdings,*

22  *LLC,* 822 F. 3d 269, 290 (6th Cir. 2016) (noting settlement administrator's testimony that response

23  rates in consumer class actions generally range from 1 to 12 percent); *see also Poertner v. Gillette*

24  *Co.,* 618 F. App'x 624, 625-26, 630-31 (11th Cir. 2015) (affirming approval of settlement less than

25  1% of potential class members filed claims); *Simon v. Toshiba Am.,* No. C 07-06202 MHP, 2010 WL

26  1757956, at *4 (N.D. Cal. Apr. 30, 2010) (granting final approval of class action settlement where two

27  percent of potential class submitted claims); *Touhey v. United States*, No. EDCV 08-01418-VAP

28  (RCx), 2011 WL 3179036, at *7-8 (C.D. Cal. July 25, 2011) (approving a settlement where 2% of

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

class members submitted claims); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377, 1384 (S.D. Fla. 2007) (approving settlement where approximately 1.2 percent of class members submitted claims); *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 370 F.Supp.2d 320, 321 (D. Me. 2005) (granting final approval of class action settlement where two percent of potential class submitted claims).

Although Dance Academy suggests that payment should have been mailed directly to class members, it provides no authority for the proposition that a claims process was improper under the circumstances present here. That alone should dispose of this argument. In any event, as the Court is well aware from the preliminary approval proceedings, the parties did not possess comprehensive and "current" data regarding class members as might be the case in an action where the defendant had an established relationship with putative class members (e.g., current employees, policy holders or client with ongoing account relationships) and, consequently, possessed reliable contact data for them. Instead, they had only the telephone numbers that a non-party purportedly called during the summer of 2016 and were required to rely on the results of a "reverse look-up" performed approximately 18 months later to obtain the names and addresses of the potential class members. Where, as here, the parties have incomplete and/or out-of-date information regarding class members, a claims-made process rather than a direct payout to class members is the norm (*see Gascho,* 822 F.3d at 276), as was explained by Plaintiff in detail connection with the renewed motion for preliminary approval (*see* ECF No. 91 at pp. 21-25). *See also* Adam S. Zimmerman, *Funding Irrationality*, 59 Duke L.J. 1105, 1167 (2010) (observing that direct payments are practical when the parties have "a great deal of information" about potential claimants, but "more problematic" when parties "have less information about potential claimants"); *Gascho,* 822 F.3d at 289-90 (noting settlement administrator's testimony that, of the more than 3,000 settlements he had administered in his 20 years in the business, fewer than 20 involved direct payment rather than a claims process).

### III.    Dance Academy's Objection Is Not Made In Good Faith

As courts within the Ninth Circuit have recognized, the motive of an objector in a class action settlement is relevant to the merits of the objection itself:

[W]hen assessing the merits of an objection to a class action settlement, courts

consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first.

*Chambers v. Whirlpool Corp.,* No. 11-1733-FMO, 2016 WL 5922456, at *2 (C.D. Cal. Oct. 11, 2016) (quoting *Dennis v. Kellogg Co*., No. 09-CV-1786-IEG (WMC), 2013 WL 6055326, at *4 n. 2 (S.D. Cal. Sep. 10, 2013)).

Here, there are several indicia of bad faith that suggest that Dance Academy has interposed its objections for reasons unrelated to the interests of the class.  First, Dance Academy and its counsel never made the slightest effort before the claims deadline to obtain the information they asserted in their original objection to be so important to their evaluation of the Settlement.  It never approached class counsel to request access to the Fayer Declaration, nor did they make a motion to unseal the Declaration. This suggests that Dance Academy (or more likely its counsel) did not really want access to the Declaration at all; but merely wanted to use the sealing of that information as a pretext to object to the settlement, and thereby hopefully gain some leverage to extract fees in exchange for eventually withdrawing its meritless objection.  Indeed, the timing of Dance Academy's objection, which was filed on the very last day of the notice period just hours before the notice period closed, suggests an intent to maximize the burden and disruption on the parties and thereby hold hostage the approximately 1.9 million other class members who do not have a problem with the Settlement and were able to evaluate its fairness.

Second, Mr. Hanigan, counsel for Dance Academy, and his co-counsel, Mr. Bandas, who is mentioned in the objection but may (or may not) be appearing, have a long and unsavory history of making last minute objections to class action settlements for this very purpose.  *See Chambers*, 2016 WL 9451360 at *2 (finding Mr. Hanigan's motives and prior conduct as a serial objector to be directly relevant to the validity of his objections and citing various prior cases in which he and his colleague have  been excoriated by courts for making improper objections) & 8* ("Most of the objections were filed by 'serial' objectors who are well-known for routinely filing meritless objections to class action settlements for the improper purpose of extracting a fee rather than to benefit the Class.  These serial objectors include . . . Timothy R. Hanigan. . ."); *Roberts v. Electrolux Home Prods*., No. 12-cv-01644, 2014 WL 4568632, *11 n.4 (C.D. Cal. Sept. 11, 2014)

Case No. 16-CV-05486-JCS

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

("Despite the withdrawal of this objection, the Court notes that the [Hanigan] objection would have been overruled in its entirety. It is unclear whether Mr. Hall even had standing to object to the Settlement. The rest of Mr. Hall's objections misunderstand or misread the Settlement Agreement, or provide no evidence or support (besides attorney argument) to advance his objection."). Given Mr. Hanigan's history, the court in *Chambers* concluded that there was "good cause to question whether Hanigan … [has] a motive other than putting the interest of the class members first." *Id*. (granting motion to compel Mr. Hanigan to submit to deposition regarding his relationship with the objector and his motive in making the objection).

The same is true of Mr. Bandas, although he remains hidden in the background in this case claiming to be General Counsel for Dance Academy. (ECF No. 112 at p. 4 ["The Dance Academy is also represented by Bandas Law Firm, PC, as its general counsel in objecting to the settlement."]). The court in *In re Cathode Ray Tube (CRT) Antitrust Litig.* opined that Mr. Bandas "routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct." 281 F.R.D. 531, 533 (N.D. Cal. 2012) (citations and footnotes omitted); *see also In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-cv-1088-BTM-KSC, 2013 WL,5275618, at *5 (S.D. Cal. Sept. 17, 2013) (striking Mr. Bandas's objections and finding that they "were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing the objections"); *In re Wal-Mart Wage & Hour Emp't Practices Litig.*, No. 06-cv-00225, 2010 U.S. Dist. LEXIS 21466, at *16-17 (D. Nev. Mar. 8, 2010) (finding that Mr. Bandas had submitted objections that were "not supported by law or the facts and are indeed meritless," and that he had "a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class").

Additional concerns about the motives of Mr. Bandas were expressed in *Garber v. Office of Comm'r of Baseball*, No. 12-CV-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017). There, although Bandas and his office drafted the objection, he refused to appear instead using local counsel. *Id*. at *2. Notably, he has done something similar here, including possibly having

*DEFENDANT'S RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT*

drafted the objection given that an attorney at his firm (Robert Clore) has appeared on the ECF system and signed the protective order in order to obtain the Fayer Declaration. (ECF No. 112 at p. 4 ["Chris Bandas of Bandas Law Firm does not presently intend on making an appearance for himself or his firm, though he reserves the right to do so."]). Moreover, Bandas argued in *Garber* that he could not be sanctioned by the court because he never entered an appearance; although Bandas denied that "his calculated decision not to file a notice of appearance was 'not to avoid sanctions,'" the court found his denial unconvincing. *Id*. at *5. The Court also added that it was "gravely concerned that Bandas uses attorneys as 'local counsel' without full disclosure of his track record and to shield himself from potential disciplinary action associated with frivolous objections." *Id*. at *12. While the *Garber* court did not end up sanctioning Mr. Bandas, it issued a damning condemnation of his practices:

> Throughout this proceeding, Bandas' behavior has been, at best, unprofessional, and at worst, an unseemly effort to extract fees from class counsel in exchange for the withdrawal of a meritless objection to the proposed class settlement . . . This Court joins the other courts throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off.

*Id*. at *5-6.

The Court should not ignore this indicia of bad faith. When juxtaposed against the lack of merit of Dance Academy's objection itself, the timing of the objection, and the background of the its counsel, this Court is fully justified in overruling Dance Academy's objection in its entirety.

## CONCLUSION

Given the significant cumulative risk that Plaintiff would lose at the summary judgment stage or at trial or, in the event it prevailed, would be unable to obtain or collect on a judgment of more than $9 million, the proposed Settlement is fair, reasonable, and adequate, and should be finally approved. For the foregoing reasons, Pivotal respectfully requests the Court overrule the objections and grant Plaintiff's Motion for Final Approval of Class Action Settlement.

DATED: August 31, 2018                THEODORA ORINGHER PC


                                      By:      /s/ Seth M. Goldstein
                                               Seth M. Goldstein
                                               Drew R. Hansen
                                               Attorneys for Defendant
                                               PIVOTAL PAYMENTS INC.